MARC E. JOHNSON, Judge.
^Defendant, Johnell Milton, appeals his attempted second degree murder conviction from the 40th Judicial District Court, Division “B”. For the following reasons, we affirm Defendant’s conviction and sentence.
FACTS AND PROCEDURAL HISTORY
On April 22, 2010, Blaine Morris and several friends went fishing from approximately 7:00 a.m. until nightfall. Terrance Bethancourt, the victim, was with Mr. Morris that day. Mr. Morris explained that he had known the victim for more than 15 years, that he is his “best friend,” and that they “hung together every day.” Mr. Morris also explained that he had known Defendant for “maybe seventeen years.”
Also fishing with Mr. Morris and the victim that day was Mr. Morris’ brother-in-law, Coy Boudin. Mr. Boudin explained that he had known the victim his entire life, and that he is his cousin, his “best friend,” and is “like a brother.” Mr. Boud-in had also known Defendant for 10 or 15 years from the Edgard community.
After returning home from fishing that night, Mr. Boudin proceeded to the Hot Spot Bar between 10:00 and 10:30 p.m. After about 20 or 30 minutes, and two |sor three cups of vodka, Mr. Boudin realized he had locked his keys in his car. He called Mr. Morris and the victim for assistance, who arrived at the bar around 11:00 p.m.
While the men attempted to unlock the car, Mr. Morris observed Defendant park and exit his car, visibly angry. Defendant exclaimed, ‘You all p* * *y a* * n* * * *rs out here chilling like they ain’t nothing going on, you know.” He continued, ‘You all don’t believe I will burn you all. Pm doing this for my home boys, Little Gip and Jock. My home boys doing twenty-five years in jail behind you all ⅜ ⅜ ⅜ ^ ⅜ ⅜ ^
Mr. Boudin, who was seated in the passenger seat of the victim’s truck, heard Defendant say that he was going to “Frank Lucas” one of the men. Mr. Boud-in explained that “Frank Lucas” refers to a character by that name in the movie “American Gangster,” in which Frank Lucas shoots a person in public.
Defendant then shook everybody’s hand, got back in his car, and said he was going home. He backed up for a moment, then pulled the car back up, got out again, and said, “You all mother f* * *ing n* * * *rs laughing at me, huh? You all don’t believe I’ll come back -with that forty caliber and burn you all mother f* * * *rs, huh?” He then left.
*162 With the efforts to unlock Mr. Boudin’s car unavailing, the police were called for assistance. An officer responded to the Hot Spot at 12:37 a.m. on April 23, 2010, unlocked the car, and departed at 12:41 a.m.
After the car had been unlocked, Mr. Morris, Mr. Boudin, and the victim remained outside the bar with several other friends. The victim sat in the driver’s seat of his truck, along with Mr. Boudin in the passenger seat.
Around 1:30 a.m., Mr. Morris stood outside talking with Ms. Chasarah Bovie, when she suddenly said, “Lord, that boy got a gun.” Mr. Morris turned to |4see Defendant walking from his car with a gun. Mr. Morris observed Mr. Boudin and Mr. Jackson flee the victim’s truck, while the victim, unable to escape, ducked down. Defendant approached the driver’s window and said, “I told you I’ll burn you all p* * *y a* ⅜ f:: * *ing n* * * *rs for nothing.” He then fired his gun at the victim. Although the gun jammed a few times, Defendant managed to discharge five or six rounds while the victim attempted to drive away.[1] As the victim attempted to drive away, Mr. Morris and Alonzo Edwards ran alongside the truck, beating on it, trying to get the victim to stop the truck. The victim, who had been shot and was bleeding from his arm and chest, stopped the truck and was moved to the passenger side; Mr. Edwards got in the driver’s seat, and Mr. Morris got in the rear seat. Mr. Morris called 911, while Mr. Edwards drove the vehicle to the Aca-dian Ambulance substation.
Around 2:00 a.m., Deputy Michael Harris of the St. John the Baptist Parish Sheriffs Office responded to the Hot Spot Bar. On the ground outside the bar, the deputy located one projectile fragment, two live rounds, and five casings. A sixth casing was later discovered inside the victim’s vehicle. The ballistics evidence was determined to be .40 caliber.
After further investigation, Detective Ann Capps of the St. John the Baptist Parish Sheriffs Office obtained an arrest warrant for Defendant approximately nine hours after the shooting. Defendant was then arrested at 11:00 a.m. on April 23, 2010. In a recorded interview, Defendant explained that he had been advised of rights, that he understood them, and that he wished to waive them and provide a statement.
In his statement, Defendant explained that he exited the Hot Spot under the influence of alcohol and, after an argument provoked by him, left the scene and 15then returned. He explained he had his gun with him the entire time. Upon his return, Defendant discharged his .40 caliber weapon three times at the victim who was four or five feet away in the driver’s seat of his vehicle. Then, out of respect for his relationship with the victim’s family and God, Defendant explained that he ceased targeting the victim, pointed the weapon in the air, and discharged three rounds. The victim, who was wounded, drove away. After realizing what he had done, Defendant prayed for the victim’s survival. Defendant then left the scene, drove to Baton Rouge, and disposed of the weapon.
On June 4, 2010, the St. John the Baptist Parish District Attorney filed a bill of information, charging Defendant with attempted second degree murder in violation of La. R.S. 14:27 and La. R.S. 14:30.1. On June 14, 2010, Defendant was arraigned and entered a plea of not guilty.
*163 On September 8, 2010, the trial court granted the District Attorney’s motion to recuse the St. John the Baptist Parish District Attorney’s office. Then, in a letter dated October 6, 2010, the Louisiana Attorney General informed the trial court that, in accordance with La.C.Cr.P. art. 680, et seq., the case had been “certified to [the attorney general] for the appointment of a District Attorney Ad Hoc.” In this same letter, pursuant to La.C.Cr.P. art. 682, the attorney general accepted the appointment as the District Attorney Ad Hoc.
On October 21, 2010, the defense filed a “Motion for Psychiatric Examination.” Then, on November 3, 2010, a St. John the Baptist Parish Grand Jury issued an indictment charging Defendant with obstruction of justice in violation of La. R.S. 14:130.1 (count one), second degree murder [2] in violation of La. R.S. 14:30.1 (count two), and possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (count three). On November 4, 2010, the court stayed Rail proceedings, including the arraignment, until a competency hearing could be conducted.
In a letter dated December 13, 2010, the Louisiana Attorney General, acting as District Attorney Ad Hoc, dismissed the charge of attempted second degree murder contained in the original bill of information, which was filed on June 4, 2010, pursuant to La.C.Cr.P. art. 691.[3]
Thereafter, on January 5, 2011, a competency hearing was held. At the conclusion of the hearing, the trial court found Defendant incompetent to stand trial. The court ordered that Defendant be committed to the East Feliciana Mental Health Facility for a period of 90 days. After 90 days, Defendant’s mental health would be reevaluated.
On April 6, 2011, the court re-evaluated Defendant and determined that he still lacked the mental capacity to stand trial but found it “likely” that his capacity could be “restored” within 90 days as a result of in-jail treatment. Thus, the trial court ordered the Department of Health and Hospitals to provide, in accordance with La.C.Cr.P. art. 648(A)(2), immediate jail-based treatment for Defendant.
After several delays, on February 17, 2012, pursuant to La.C.Cr.P. art. 561,[4] Defendant filed a “Motion to Change Plea to ‘Not Guilty and Not Guilty by Reason of Insanity.’ ” On March 7, 2012, after the court re-evaluated Defendant Land found him competent to stand trial, Defendant changed his plea from not guilty to not guilty and not guilty by reason of insanity.
*164 On August 20, 2012, the State dismissed count one and amended count two, reducing it to a charge of attempted second degree murder in violation of La. R.S. 14:27 and 14:30.1. That same day, the trial court granted the defense’s motion to sever the two remaining charges.
On August 21, 2012, Defendant proceeded to trial on the charge of attempted second degree murder. Defendant was re-arraigned and entered a plea of not guilty and not guilty by reason of insanity. On August 22, 2012, a 12-person jury unanimously found Defendant guilty as charged.
On September 5, 2012, the State filed a habitual offender bill of information, alleging Defendant to be a second felony offender. On September 7, 2012, Defendant filed a “Motion for Judgment of Acquittal and Alternatively for a New Trial.” On September 17, 2012, the trial court denied the motions. Also on that day, Defendant was arraigned on the habitual offender bill and denied the allegations therein.
On November 13, 2012, Defendant filed a “Motion to Deviate from the Mandatory Minimum Sentence.” The sentencing hearing was held on November 15, 2012, at which defense counsel explained the “Motion to Deviate” would not be triggered until the habitual offender adjudication had been completed and sentence had been imposed. Also that day, on the attempted second degree murder conviction, the trial court sentenced Defendant to 40 years at hard labor without benefit of parole, probation, or suspension of sentence.
On December 18, 2012, the trial court adjudicated Defendant a second felony offender. On January 23, 2013, the trial court vacated Defendant’s original [ ^sentence and imposed an enhanced sentence of 40 years at hard labor without benefit of parole, probation, or suspension of sentence.
On that same day, after sentencing, defense counsel noted that a notice of appeal had not been filed in regard to Defendant’s underlying conviction and sentence. Counsel informed the court of his intention to file a motion for an out-of-time appeal in relation to the original conviction and sentence. The court stated that it would grant such motion. Defense counsel then informed the court of his intention to file a notice of appeal relative to the habitual offender adjudication and sentence. Only one motion for appeal was filed and granted on January 30, 2013. Defendant did not raise on appeal any issues relating to the habitual offender proceedings.
ASSIGNMENTS OF ERROR
On appeal, Defendant raises the following assignments of error: 1) there was insufficient evidence to convict him of attempted second degree murder; 2) the trial court erred in denying his motion to suppress statement; and 3) the trial court erred by denying his challenges for cause of jurors Margaret Schleismann, Allison Schexnayder, Nancy Rome and Lee McGuire.
LAW AND ANALYSIS

Sufficiency of Evidence

In this assignment of error, Defendant argues that his conviction is not supported by the evidence, since no rational trier of fact could have found that the defense failed to carry its burden of proving by a preponderance of the evidence that Defendant was insane at the time of the offense.
In response, the State argues that Defendant’s claim of insanity at the time of the offense is contradicted by the testimony of Drs. Charles Vosburg and Robert Storer, as well as by Defendant’s actions during and after the shooting.
*165 | qIn Louisiana, the law presumes a criminal defendant is sane. State v. Abbott, 11-1162 (La.App. 5 Cir. 5/31/12); 97 So.3d 1066, 1068, citing La. R.S. 15:432. To rebut this presumption of sanity and avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. Id., citing La.C.Cr.P. art. 652. This burden is not borne by proving the mere existence of a mental disease or defect. See Id. Rather, to be exempted from criminal responsibility, the defendant must show he suffered a mental disease or defect which prevented him from distinguishing between right and wrong at the time he committed the conduct in question. Id., citing La. R.S. 14:14.
The determination of sanity is a factual matter. Id. In considering an accused’s plea of not guilty and not guilty by reason of insanity, the trier of fact must first determine whether the State has proven the essential elements of the charged offense beyond a reasonable doubt. Id. at 1068-69. The trier of fact may then proceed to the determination of whether the defendant was incapable of distinguishing between right and wrong at the time of the offense. Id. at 1069.
All evidence, including both expert and lay testimony, along with the defendant’s conduct and actions before and after the crime, may be considered in determining whether the defendant has met his burden of proof. Id. On review of a claim for sufficiency of evidence in an action where an insanity defense has been raised, the appellate court, applying the standard outlined in Jackson v. Virginia,[5] must determine whether under the facts and circumstances of the case, any rational fact-finder, viewing the evidence in a light most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. Id.
|1flIn order to prove attempted second degree murder, the State must establish beyond a reasonable doubt that the defendant specifically intended to kill a human being and that he committed an overt act in furtherance of that goal. State v. Robertson, 11-1017 (La.App. 5 Cir. 5/31/12); 98 So.3d 401, 406, writ denied, 12-1432 (La.1/11/13); 106 So.3d 547. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Id. at 405. Specific criminal intent, as a state of mind, need not be proven as fact but may be inferred from the circumstances and the actions of the accused. Id. For instance, the specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing in the direction of the victim. Id. In Robertson, this Court found the evidence was sufficient to support a conviction for attempted second degree murder where the defendant discharged a .45 caliber handgun seven times into a vehicle containing two occupants. Id. at 406.
In the present case, Defendant was charged with and convicted of attempted second degree murder in violation of La. R.S. 14:27 and 14:30.1. Both Mr. Morris and Mr. Boudin testified that Defendant levied threats that he would shoot someone that night. Mr. Morris even heard Defendant specify that he would use a .40 caliber weapon. Soon thereafter, both Mr. Morris and Mr. Boudin observed Defendant discharge a handgun several times at the victim, who was seated in his vehicle. The subsequent police investigation revealed *166 that a .40 caliber weapon had been used. And most notably, Defendant himself confessed that he aimed his .40 caliber handgun at the victim and discharged it several times from a distance of four or five feet.
After reviewing the testimony of several witnesses, including Defendant himself, in addition to the physical evidence, we find the evidence was sufficient |nfor any rational trier of fact to conclude beyond a reasonable doubt that Defendant discharged a handgun several times at the victim. Such an act, we find, established that Defendant possessed the specific intent to kill and constituted an overt act committed in furtherance of that goal. We will now consider whether Defendant bore his burden of proving by a preponderance of the evidence that he was insane at the time of the offense.
At trial, Ms. Brenda Milton, Defendant’s mother, testified that Defendant has a history of mental illness. Ms. Milton explained that Defendant is a delusional paranoid schizophrenic, psychotic, and suffers from memory loss. She explained that the onset of these illnesses began on November 27, 1999, when Defendant suffered a severe head injury in a car accident, being ejected through the windshield and thrown 50 feet. Defendant underwent surgery, and for four to six months thereafter, lost the use of one leg and arm, as well as suffered memory loss.
The defense called Dr. Charles Vosburg, an expert in the field of forensic psychology, who had evaluated Defendant three times to determine if he was competent to proceed to trial. Dr. Vosburg explained that as a result of the car accident, Defendant sustained major damage to the left temporal region of his brain, requiring neurosurgery. The doctor added that an injury to this region of the brain may result in seizures, as well as frequent mood problems, such as depression, anger, rage, irritability, poor judgment, poor insight, and poor impulse control. Since the accident, Defendant had suffered from seizures and had displayed “rage attacks.”
Dr. Vosburg also observed that since the injury, the severity and frequency of Defendant’s assaultive behavior had dramatically escalated. Prior to his injury, Defendant had two criminal convictions: battery and resisting arrest. And, Defendant’s mother testified that as time progressed after the surgery, her son’s 112mental condition deteriorated, where he was always angry and could not control himself. Ms. Milton described several incidents where Defendant was involved in physical altercations. These included Defendant striking two people and dragging his mother down steps. Consequently, Ms. Milton had Defendant admitted to the psychiatric ward at Charity Hospital, where he was diagnosed with schizophrenia. Dr. Vos-burg explained that he disagreed with this diagnosis and believed that Defendant was exaggerating his claimed memory problems, where the doctor did not observe any evidence of short term memory loss.
In rebuttal, the State called Dr. Robert Storer, an expert in the field of clinical forensic psychology, who, after Defendant was indicted in this matter, evaluated him seven to ten times at the East Feliciana Hospital. Dr. Storer concurred with Dr. Vosburg’s determination that Defendant’s assaultive behavior dramatically escalated after the surgery. Dr. Storer also agreed with Dr. Vosburg’s opinion that Defendant’s claims of memory loss were exaggerated, where he too did not observe any evidence thereof. In fact, at each of their meetings, Dr. Storer noted that Defendant was able to recognize the doctor and recall details of their previous meetings.
In an effort to determine if and to what degree Defendant was exaggerating his *167 symptoms, Dr. Storer administered the Structured Inventory of Malingered Symp-tomology (“SIMS”) test. The SIMS test assesses whether a person is “malingering,” a medical term that refers to a condition in which a person either exaggerates or fabricates symptoms in order to gain a benefit or avoid a detriment.
The test is scored on five different scales. On the psychosis scale, any score greater than one suggests malingering. Defendant scored nine. On the neurologic impairment scale, any score greater than two suggests malingering. | ^Defendant scored 12. On the amnestic disorder scale (memory loss), any score greater than two suggests malingering. Defendant scored 11. On the low intelligence scale, any score greater than two suggests malingering. Defendant scored three. And on the affective disorder scale, any score greater than five suggests malingering. Defendant scored five. In addition, an overall score on the SIMS test is calculated, which Dr. Storer explained is the most reliable indicator for malingering. Any score greater than 14 suggests malingering. Defendant scored 40.
On appeal, Defendant maintains that he bore his burden. In support of his position, he relies on Dr. Vosburg’s testimony that “some people with [a] severe mood disorder will, when it elevates to the psychotic proportion or out of touch with reality proportion!,] ... [experience] some difficulty differentiating right from wrong.” Because Defendant sustained a brain injury that often results in mood problems, he argues he could not differentiate right from wrong.
Dr. Vosburg’s testimony indicates that only a limited number of people with a severe mood disorder experience difficulty differentiating right from wrong. The doctor did not specify that Defendant is included in this limited number, and he did not testify that Defendant suffered from a “severe” mood disorder or that Defendant had any difficulty differentiating right from wrong. He merely explained that Defendant sustained an injury to the region of his brain that frequently results in mood problems. Thus, we find Defendant’s position on this point is not supported by the evidence.
Defendant also points to his diagnosis of schizophrenia as evidence of his alleged insanity. Although Defendant’s mother testified that he was diagnosed with schizophrenia, Dr. Vosburg testified that he disagreed with this diagnosis. Dr. Vos-burg was also skeptical of Defendant’s claim that he suffered from memory | uloss. The doctor failed to observe any indications of a short term memory deficit and concluded that Defendant was exaggerating this symptom. The State’s expert witness, Dr. Storer, concurred in this assessment. Dr. Storer also did not observe any loss of memory, and the results of the SIMS test suggested that Defendant was either fabricating or exaggerating his symptoms.
Defendant also relies on the escalation in his assaultive behavior as evidence of his alleged insanity. Although Defendant’s mother and both doctors observed this escalation in his behavior, neither doctor testified as to any correlation between this and an inability to distinguish right from wrong. A propensity to commit wrong acts does not necessarily entail an inability to differentiate right from wrong.
Furthermore, we find Defendant’s actions during and after the shooting do not support a finding of insanity. The evidence adduced at trial established that Defendant, albeit for unclear reasons, appeared on the scene angry and yelling, and threatened the victim and his friends. According to Defendant, he was armed at *168 this time, but he left the scene without resorting to violence. Yet, when he returned to the scene, he carried out his threat by shooting the victim.
If Defendant was armed during the initial encounter, as he contends, but left the scene and returned before carrying through with his threat, we find this delayed consummation of the threat exhibits a degree of self-control inconsistent with a claim of insanity. On the other hand, even if Defendant was not armed during the initial encounter and left to retrieve his weapon, this, too, demonstrates a degree of calculation inconsistent with insanity.
After firing his weapon three times at the victim, Defendant, apparently realizing what he had done, shifted his aim and discharged the remaining rounds into the air, as he explained, out of respect for his relationship with the victim’s 1^family and God. Defendant then drove to Baton Rouge and disposed of the weapon. Then, in his statement, given within 24 hours of the shooting, Defendant declared that he felt guilty for what he had done and that he prayed for the victim’s survival.
Defendant’s decision to shift his aim away from the victim, his subsequent feeling of guilt, prayers for the victim, flight to Baton Rouge, and disposal of the weapon all demonstrate that Defendant had a guilty conscience and recognized his culpability for his actions. See State v. Jones, 12-750 (La.App. 5 Cir. 5/16/13); 119 So.3d 250, 257 n. 8 (finding a defendant’s flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience). Thus, we find that through his actions, Defendant displayed a functioning ability to distinguish right from wrong.
Viewing the foregoing evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have concluded that Defendant failed to prove by a preponderance of the evidence that he was unable to distinguish between right and wrong at the time of the offense.

Challenges for Cause

In this assignment of error, Defendant argues that the trial court erred in denying his challenges for cause as to four prospective jurors. The State responds that the trial court did not abuse its discretion in denying Defendant’s challenges for cause.
The Sixth Amendment to the United States Constitution guarantees the accused the right to trial by an impartial jury. State v. Munson, 12-327 (La.App. 5 Cir. 4/10/13); 115 So.3d 6, 12, writ denied, 13-1083 (La.11/22/13); 126 So.3d 476. Further, La. Const. Art. I, § 17 guarantees the accused the right to full voir dire examination of prospective jurors and the right to challenge those jurors 1ir,peremptorily. La.C.Cr.P. art. 797 sets foi'th the grounds for which a juror may be challenged for cause.
In ruling on challenges for cause, the trial judge is vested with broad discretion; his ruling will be reversed only when a review of the entire voir dire reveals that the judge’s exercise of discretion was arbitrary and unreasonable with resultant prejudice to the accused. Munson, 115 So.3d at 12. On appeal, to prove an error warranting reversal of both the conviction and sentence, a defendant must show that he exhausted all of his peremptory challenges and that the trial court erroneously denied a challenge for cause. State v. Mickel, 07-47 (La.App. 5 Cir. 5/29/07); 961 So.2d 516, 522, writ denied, 07-1422 (La.1/7/08); 973 So.2d 732.
In the instant case, since Defendant was charged with an offense that was punishable necessarily by imprisonment at hard labor, he was entitled to 12 peremp *169 tory challenges pursuant to La.C.Cr.P. art. 799. However, a review of both the minute entry and the transcript reveals that Defendant did not exhaust all of his peremptory challenges, using only 11 of 12.[6] As a result, Defendant is precluded from obtaining relief on this claim, and we choose not to address the issues of whether the trial court erred in denying Defendant’s challenges for cause. See State v. Koon, 96-1208 (La.5/20/97); 704 So.2d 756, 767, cert. denied, 522 U.S. 1001, 118 S.Ct. 570,139 L.Ed.2d 410 (declining to consider defendant’s claim that trial court erred in denying defense challenge for cause due to defendant’s failure to exhaust peremptory challenges).

Denial of Motion to Suppress

In this assignment of error, Defendant argues that the trial court erred in denying his motion to suppress his statement. He contends his statement should |17have been suppressed because he lacked the mental capacity to knowingly and voluntarily waive his rights.
The State responds that the evidence indicated Defendant understood his rights and that he knowingly and voluntarily waived them. Consequently, the State submits that the trial court did not abuse its discretion in denying Defendant’s motion to suppress.
On March 19, 2012, Defendant filed a “Motion to Suppress Statement,” in which he sought to have his statement suppressed on numerous grounds, one of which was due to a mental disease or defect and, therefore, lacked the capacity to waive his rights. On May 31, 2012, the trial court denied this motion. Defendant objected and now seeks review of the denial on appeal.
When ruling on a motion to suppress, trial courts are vested with great discretion. State v. Smith, 11-638 (La.App. 5 Cir. 3/13/12); 90 So.3d 1114, 1120. Thus, the ruling of a trial judge on a motion to suppress will not be disturbed absent an abuse of that discretion. Also, a trial court’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the defendant’s confession are accorded great weight and will not be disturbed unless they are not supported by the evidence. In reviewing a trial court’s ruling on a pretrial motion to suppress, an appellate court may review the testimony adduced at trial, in addition to the testimony adduced at the suppression hearing. Id.
Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda rights, that he voluntarily and intelligently waived those rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises. Id. In cases involving allegations of diminished mental 118capacity, a defendant has the burden of proving the existence of any mental abnormality that might render his confession per se involuntary. State v. Pugh, 02-171 (La.App. 5 Cir. 10/16/02); 831 So.2d 341, 352. The voluntariness of a statement is determined on a case-by-case basis and is based upon a totality of the circumstances. Smith at 1120-21.
*170 Because Defendant’s statements were offered while he was in custody, the first issue to be addressed is whether he was adequately advised of his constitutional rights. In State v. Allen, 06-778 (La.App. 5 Cir. 4/24/07); 955 So.2d 742, 752, writ denied, 08-2432 (La.1/30/09); 999 So.2d 754, this Court determined that the defendant had been properly advised of his Miranda[7] rights when testimony established that the defendant had been read his rights several times—upon his arrest, upon his placement in the police vehicle, and immediately prior to his confession— and a rights of arrestee form had been executed which was specifically referenced at the beginning of his confession.
Soon after Defendant’s arrest, Detective Jerry Fountain of the St. John the Baptist Parish Sheriffs Office advised Defendant of his rights with a rights of arres-tee form. At the suppression hearing, Detective Fountain testified that he had no reason to believe Defendant did not understand his rights. Defendant signed the form, attesting that he understood his rights and that he was willing to waive them. Then, before providing his statement, Defendant again confirmed that he understood his rights and was willing to answér questions without an attorney.
Although the defendant in Allen was advised of his rights several times, and the record in the instant case reflects Defendant was advised of his Miranda rights only once, there is no indication that this advisal was inadequate. The record | ^indicates that, in conformity with Miranda,[8] Defendant was advised of the following:
You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer for advice before you answer any questions and you may have the lawyer with you during questioning. If you want a lawyer during questioning but cannot afford one, a lawyer will be provided for you at no cost to you prior to questioning. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time in order to get the advice of a lawyer or for any other reason you may have.
In view of the foregoing, we find Defendant was satisfactorily advised of his Miranda rights.
The next matter, then, is whether Defendant’s waiver of those rights was intelligent and voluntary. This is the crux of Defendant’s argument. Defendant contends his waiver of rights was neither intelligent nor voluntary because he lacked the capacity to make such a waiver due to a mental disease or defect.
This Court has recognized that a diminished intellectual capacity does not, alone, vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. State v. Pugh, 02-171 (La.App. 5 Cir. 10/16/02); 831 So.2d 341, 352-53. The critical factor is whether the defendant was able to understand the rights ex *171 plained to him and voluntarily gave the statement. Id.
For instance, in State v. Green, 94-0887 (La.5/22/95); 655 So.2d 272, 281-82, the Louisiana Supreme Court determined the defendant’s waiver of his rights was valid, even though the defendant was “mildly retarded,” had a 12(lmental age of ten years, and suffered from “brain dysfunction.” In fact, it was even the forensic psychology expert’s opinion that the defendant had been unable to understand his rights as read to him by the interrogating officers. Id. at 282. Conversely, the officers testified that they believed the defendant knowingly waived his rights. Id. at 281.
In concluding that the State had met its burden of showing the defendant validly waived his rights, the supreme court relied on several factors. First, the court noted the circumstances surrounding the defendant’s interrogation, specifically that the defendant initially attempted to “extricate himself from culpability for the murder, and the evolution of his statements over time, in response to new facts presented [defendant] by the detectives, reveal[ed] a mental agility and adaptability which cannot be readily associated with [a] diminished mental capacity....” Id. at 282.
The court also observed that extrinsic facts, i.e., the location of the gun, the details of the crime scene, etc., corroborated the defendant’s confession. Id. at 283. Although the accuracy of the defendant’s confession was not the object of the court’s inquiry, the court reasoned that where a defendant claims his mental processes are so dysfunctional as to preclude a full understanding of his rights, “any facts which shed light upon the functioning of that defendant’s mental processes are relevant and pertinent evidence.” Id.; accord State v. Brooks, 92-3331 (La.1/17/95); 648 So.2d 366, 374 (finding extrinsic corroboration is “an additional factor ... to consider in evaluating the clarity of [a defendant’s] mental processes at the time of his confession.”). Thus, the court found the defendant’s capacity to accurately recall specific details of the crime scene was a factor bearing upon his ability to understand his rights. Id. at 283.
121 Lastly, the court found the defendant’s criminal history — specifically, his repeated exposure to his Miranda rights — was another factor supporting the determination that defendant understood his rights. Id. The court found the defendant’s familiarity with the criminal justice process suggested that he was not “a young man suddenly injected into a foreign environment, but rather showed that [the defendant’s] custodial interrogation was an experience to which he was not a stranger.” Id.
Similarly, in State v. Trudell, 350 So.2d 658, 662-63 (La.1977), the Louisiana Supreme Court concluded that the defendant’s waiver of his Miranda rights was valid, even though he was “mentally retarded,” “psychotic,” “easily led and very suggestible,” and had a mental age of nine years. The defendant in Trudell had also twice been found incompetent to stand trial before ultimately being declared competent. Id. at 660-61.
In concluding that the State had met its burden of showing the defendant validly waived his rights, the supreme court relied on several factors. First, the interrogating officers offered unrebutted testimony that the statements were made voluntarily. Id. at 662-63. Second, the sanity commission found the transcripts of the defendant’s statements did not reveal any evidence of psychosis. Id. And third, the defendant provided “coherent and responsive answers with only very minor inconsistencies” during the interrogation. Id. at 663. The court found his statements revealed that he “was lucid, oriented as to *172 time and place, and apparently in control of his faculties at that time.” Id.
Likewise, in the instant case, we find several factors indicate Defendant possessed the mental capacity to knowingly and voluntarily waive his rights. First, the record reveals that Defendant, unlike those in Green and Trudell, is highly educated. Defendant obtained a bachelor’s degree in computer science from [ 22Grambling University in 1996. And following his brain injury in 1999, he returned to school and obtained an associate’s degree in instrument process and technology.
Second, in his interrogation, we find Defendant displayed a capacity to accurately recall specific details of the crime and an ability to communicate them cogently. Defendant provided responsive answers to the detective’s questions, the details of which were corroborated by eyewitness testimony and physical evidence. Defendant stated that he fired approximately six rounds, and the ballistics evidence indicated six rounds had been discharged on the scene. Defendant stated he used a .40 caliber weapon. Mr. Morris testified that Defendant threatened to use a .40 caliber weapon; and, the ballistics evidence confirmed that a .40 caliber weapon had been used.
Third, as in Trudell, the interrogating officers in the present case offered unre-butted testimony that Defendant’s statement was made knowingly and voluntarily. Both Detective Fountain and Detective Capps testified at the suppression hearing that they had no reason to believe Defendant did not understand his rights. And, this Court has recognized that testimony of an interviewing police officer alone may be sufficient proof that a defendant’s statements were freely and voluntarily given. See State v. Cambrice, 10-26 (La.App. 5 Cir. 4/26/11); 64 So.Sd 363, 376, writ denied, 11-1181 (La.3/23/12); 84 So.3d 568.
Fourth, like Green, the record here reveals that Defendant is no stranger to the criminal justice system. Defendant was adjudicated a second felony offender, having been previously convicted of possession of cocaine.
And lastly, there is no indication Defendant waived his rights or offered his statement under the influence of fear, intimidation, menaces, threats, inducements, IgjQr promises. On his waiver of rights form and in his statement, Defendant acknowledged that he had not been promised or threatened to waive his rights. Additionally, Detective Fountain testified at the suppression hearing that Defendant was not coerced into waiving his rights.
In view of the foregoing, we find the State met its burden of showing Defendant understood Miranda his rights and voluntarily waived them. As a result, we conclude that the trial court did not abuse its discretion in denying Defendant’s motion to suppress his statement.

Error Patent Discussion

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920, State v. Oliveaux, 312 So.2d 337 (La.1975), and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990). There are no errors patent that require corrective action.
DECREE
For the foregoing reasons, Johnell Milton’s conviction and sentence are affirmed.

AFFIRMED.

. Mr. Boudin testified that after Defendant discharged the weapon once, it jammed. It was at this time that Mr. Boudin jumped out of the truck and fled.

. The indictment erroneously listed the charge as second degree murder. The indictment was later amended to reflect the charge of attempted second degree murder.

. La.C.Cr.P. art. 691 provides:
The district attorney has the power, in his discretion, to dismiss an indictment or a count in an indictment, and in order to exercise that power it is not necessary that he obtain consent of the court. The dismissal may be made orally by the district attorney in open court, or by a written statement of the dismissal signed by the district attorney and filed with the clerk of court. The clerk of court shall cause the dismissal to be entered on the minutes of the court.
Although it appears the Attorney General's letter was filed with the clerk of court, the minutes do not reflect that the dismissal was entered therein.

.La.C.Cr.P. art. 561 provides:
The defendant may withdraw a plea of “not guilty” and enter a plea of "not guilty and not guilty by reason of insanity,” within ten days after arraignment. Thereafter, the court may, for good cause shown, allow such a change of plea at any time before the commencement of the trial.

. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

. The 11 prospective jurors the defense struck peremptorily were: 1) Margaret Schleismann, 2) Alison Schexnayder, 3) Nancy Rome, 4) Nolan Jacob, 5) Lee Maguire, 6) Arlene Martin, 7) Linda Ladner, 8) Jammi Amedee, 9) Paul Goodrum, 10) Neil McKendall, and 11) Felicia Hurst.

. Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).

. In Miranda, 384 U.S. at 478-79, 86 S.Ct. 1602, the United States Supreme Court held:
[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, ... he must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him pri- or to any questioning if he so desires.