ROBERT A. CHAISSON, Judge.
Lin this appeal, defendant, Steven D. Carter, challenges his convictions for aggravated kidnapping and aggravated rape. For the reasons that follow, we affirm defendant’s convictions and sentences.

PROCEDURAL HISTORY

On September 12, 2013, the Jefferson Parish Grand Jury returned an indictment charging defendant with one count of aggravated kidnapping of a child, in violation of LSA-R.S. 14:44.2, and one count of aggravated rape, in violation of LSA-R.S. 14:42. Defendant originally pled not guilty; however, on October 21, 2013, he changed his plea to not guilty and not guilty by reason of insanity.
The case proceeded to trial before a twelve-person jury on July 7, 2014. After considering the evidence presented, the jury, on July 10, 2014, found defendant guiltyas charged on both counts. On July 31, 2014, the trial court sentenced defendant, on each count, to life imprisonment without benefit of parole, | sprobation, or suspension of sentence, to run consecutively with one another. Defendant now appeals.

FACTS

In the summer of 2013, the victim, seven-year-old J.W.,[1] lived with her mother at an apartment complex located on Eden-bom Avenue in Jefferson Parish. On June 5, 2013, at approximately 5:00 p.m., J.W-was outside with friends by the gate in front of the apartment complex, waiting for the church van to pick them up for Bible study. While by the gate, a man, subsequently determined to be defendant, got out of a car, approached the children, picked up J.W., put her in the front passenger seat of his car, and drove away. According to J.W., defendant told her that if she did what he said, she would see her mother faster. Defendant thereafter forced her to perform oral sex on him as he was driving.
Approximately one hour after being abducted, J.W. was released about two miles from her apartment complex and found by Dr. Janet Linskey-Sanders. According to Dr. Linskey-Sanders, she had just picked up her son from a friend’s house near Clearview Mall, and as she was driving home, she saw a little girl walking fast and waving her hands in the air. The girl had tears coming down her face and appeared distressed. Dr. Linskey-Sanders stopped her car and asked the little girl what was wrong. The child told her that a man took her, that she did not know where she was, and that she wanted her “mommy.” When Dr. LinskeySanders asked the child if she was hurt, she replied, “He made me suck his p — y.” Dr. Linskey-Sanders called the police and waited with the child until they arrived.
Detective Donald Zanotelli of the Jefferson Parish Sheriffs Office, the lead investigator, left the scene of the kidnapping, went to the location where J.W. had been found, and transported her to Children’s *330 Hospital. Upon her arrival, Dr. Ian 14ZIatkiss, an emergency room physician, conducted a physical examination and collected evidence from J.W., including swabs from her mouth. In the process of her examination, J.W. advised the doctor that she was kidnapped and the man made her “lick his privates.” J.W. was also evaluated by Dr. Neha Mehta at the Audrey Hepburn Care Center. In discussing the incident, J.W. told Dr. Mehta that the man who was driving the car made her “lick his cooka” and that “[i]t had hair at the bottom.”
After the recovery of the victim, the officers focused their attention on determining the identity of the perpetrator. The officers, who responded to the scene of the kidnapping, had obtained a description of the perpetrator from the girls playing outside with J.W. at the time she was abducted. In addition, the officers had the opportunity to view the footage from cameras at the apartment complex. From this footage, the officers were able to obtain a description of the perpetrator and his vehicle. Lieutenant Dax Russo of the Jefferson Parish Sheriffs Office conducted some computer searches with the available information and developed defendant as a suspect. The officers talked to defendant’s family members, and based on these discussions, located defendant that night at the Odyssey House in New Orleans. After the officers advised defendant of the investigation, he agreed to go back to the detective bureau with them.
Detective Zanotelli advised defendant of his rights, and defendant thereafter waived his rights and gave a taped statement. In the statement, defendant recalled that he was “out of ... [his] head,” that he was “loaded on crack and drin-kin[g],” and that he “apparently grabbed ... a little black girl.” Defendant claimed that he did not really recall the details but at some point realized that “she was over in [his] lap,” and that his pants were unzipped. In his statement, he said that he did not think “it went on for any more than five seconds.” When the detective ^thereafter asked him what went on for five seconds, defendant replied, “I guess oral sex.” Detective Zanotelli also asked defendant if he recalled the girl’s mouth on his penis, to which defendant responded, “... that’s when I kind of snapped into it and was like what the f— am I doin[g].” Defendant then let the girl out of the car.
At some point that evening, DNA swabs were taken from defendant’s mouth and penis. David Cox, an expert in the field of forensic DNA analysis, testified that in connection with this case, he compared both reference samples and forensic samples taken from defendant and J.W. As a result of his analysis, Mr. Cox concluded that J.W. and defendant could not be excluded as contributors of the DNA in the mixture sample from defendant’s penis. He further testified that the DNA profile obtained from the swab of defendant’s penis was greater than one hundred billion times more likely to be a mixture of DNA from defendant and J.W. than a mixture of DNA from defendant and an unknown, unrelated individual. Mr. Cox further testified that “there was definite contact between [J.W.] and the penis of [defendant].”
At trial, defendant testified on his own behalf. He admitted that he had a substance abuse problem and claimed that he was loaded on illegal drugs, alcohol, and pain pills on the day of the incident. According to defendant, on June 5, 2013, he and Justin Sortino obtained some crack cocaine, and after they finished using it, defendant wanted to get some more. Later, defendant obtained additional crack cocaine, and he and Mr. Sortino went to the park where they smoked and injected the crack. According to defendant, this *331 was the first time he had injected crack cocaine, and the feeling from injecting the cocaine was more intense than when he smoked it. Defendant then went with Mr. Sortino to a gas station and left Mr. Sorti-no there because he wanted the rest of the cocaine for himself. Defendant | (¡turned off into a neighborhood where he mixed up the crack cocaine with a crushed pill of roxycontin. He then put this mixture into a syringe and injected it. At trial, defendant testified that after he injected the drugs, he felt nauseous and then he had a very hazy “realization ... of having somebody in [his] car.” He maintained that after injecting the drugs, he had no recollection of what happened; he explained that his next conscious memory was waking up at the lakefront. Defendant claimed that when he gave his statement, he did not have a recollection of the events, but rather gave his statement with information provided by the police. He asserted that he was trying to be cooperative because the police advised him that it would be in his best interest to give a statement.
In addition to testifying on his own behalf, defendant presented the testimony of several other witnesses. Justin Sortino testified and confirmed defendant’s testimony that on the day of the incident, the two of them had obtained and used crack cocaine. Mr. Sortino also verified that they had gone to a gas station and that defendant had left him there when he went inside to get some change.
Some of defendant’s family members also testified. Connie Carter, defendant’s mother, acknowledged defendant’s substance abuse problems which started after he gave his baby up for adoption. His substance abuse problems escalated, and he checked himself into a rehabilitation center several months before the incident. He left the program early and started using drugs again. Approximately one week before the incident, she found a pipe and asked defendant to leave the house. She also testified that defendant had been having seizures and had hit his head; however, defendant had not undergone any neurological testing or psychiatric treatment or evaluation prior to the date of the incident.
17Wesley Carter, defendant’s father, testified that his son played football in high school and suffered concussion-type injuries; however, defendant never underwent any neurological testing. He also recalled an incident when defendant collapsed to the floor, and when he “came to,” he had no recollection of what had occurred. Ryan Carter, defendant’s brother, recalled that on at least six occasions, defendant had seizures and lost consciousness. He further testified that to his knowledge, defendant was not drinking or using drugs when the seizures occurred.
At trial, defendant also presented the testimony of Dr. Bhushan Agharkar, who was accepted as an expert in the field of forensic psychiatry. Dr. Agharkar examined defendant and, based on his screenings, concluded that defendant had “soft signs of neurologic impairment or organic brain dysfunction.” In his opinion, defendant’s brain damage combined with his injection of the drugs would result in “a very sudden and a very powerful rush,” which could produce a delirium. Dr. Ag-harkar explained a delirium as “an altered state of consciousness ... where you may be acting in a way that looks purposeful, ... but then not necessarily have the decision-making or the memory for it.”
Dr. Robert Shaffer, accepted as an expert in forensic psychology and neuropsy-chology, also examined defendant. After interviewing family members and conducting a battery of tests on defendant, Dr. Shaffer determined that defendant suf *332 fered from a “seizure spectrum disorder” and a “pervasive depression condition.” In his opinion, the abduction and forced oral sex with the young child was an “anomalous outcome.” He described the incident as an “unusual circumstance” given defendant’s personality and history, and he attributed defendant’s actions to a massive intake of drugs in a format he did not typically use. Dr. Shaffer also expressed his belief that defendant did not have the ability to distinguish right from wrong at the time of the incident.

J£URY INSTRUCTIONS

In his first assigned error, defendant argues that the trial court erred in giving the special jury charge on the defense of insanity requested by the State. On July 9, 2014, the State, citing State v. Milton, 13-672 (La.App. 5 Cir. 5/14/14), 142 So.3d 157, 164-65, requested the inclusion of the following special charge in the jury instructions:
The burden of proving the affirmative defense of insanity is not borne by proving the mere existence of a mental disease or defect; rather to be exempted from criminal responsibility, the defendant must Inshow he suffered from a mental disease or defect which prevented him from distinguishing between right and wrong at the time he committed the conduct in question.
Defendant objected to the inclusion of this charge on the basis that it was repetitive and confusing to the jury. In denying defendant’s objection to the special charge, the trial court stated as follows:
The Court has included that — that definition in the paragraph. The Court during the conference offered to consider any combination of these three paragraphs. The Court does not find that they in any, way, shape or form accentuate over and over the exact same principle. There are nuances to each paragraph. In a case of this nature, the point of jury instructions is to reduce jury confusion. It is a correct statement of law. The mere existence of a mental disease or defect is a portion of the requirement of law.
Again, the Court finds it’s a correct statement of law. The Court further notes that there are additional instructions within the entirety of the jury instructions wherein it states that you are not to consider one instruction more important than another. So the Court finds that it is an appropriate instruction.
Thereafter, the court charged the jury as follows:
The defendant has the burden of proving his insanity at the time of the commission of the offense. The defendant must meet that burden by a preponderance of the evidence. Thus, the defendant must establish that it is more probable than not that he was insane at the time of the commission of the crime.
The burden of proving the affirmative defense of insanity is not borne by proving the mere existence of a mental disease or defect; rather to be exempted from criminal responsibility, the defendant must show he suffered from a mental disease or defect which prevented him from distinguishing between right and wrong at the time he committed the conduct in question.
Insanity at the time of the commission of a crime exempts or relieves the offender from criminal responsibility. If the circumstances indicate that because of a mental disease or mental defect the defendant was incapable of distinguishing between right and wrong with reference to the conduct in question, the defendant must be found “not guilty by reason of insanity.”
*333 Defendant now argues that the trial court erred in giving this special jury charge requested by the State. He specifically complains about the trial court’s “gratuitous reference to the ‘mere’ existence of a mental disease or defect[.]” Further, defendant challenges the portion of the charge that required proof that the mental disease or defect “prevented” defendant from distinguishing right from wrong. Defendant maintains that the charge as given to the jury “served to denigrate the defense of insanity and mislead the jury as to how to apply its elements to the facts of this case.” For the reasons that follow, we find no merit to defendant’s argument.
LSA-C.Cr.P. art. 802 provides as follows:
The court shall charge the jury:
(1) As to the law applicable to the case;
(2) That the jury is the judge of the law and of the facts on the question of guilt or innocence, but that it has the duty to accept and to apply the law as given by the court; and
(3) That the jury alone shall determine the weight and credibility of the evidence.
LSA-C.Cr.P. art. 803 further provides, in pertinent part: “When a defendant has specially pleaded insanity in accordance with Article 552, the court shall charge the jury with respect to the law applicable thereto.” Under LSA-C.Cr.P. art. 807, a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent.
| min the present case, the jury instructions given by the trial court correctly reflect the law in Louisiana relating to the defense of insanity. In Louisiana, the law presumes a criminal defendant is sane. LSA-R.S. 15:432. To rebut this presumption of sanity and avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. LSA-C.Cr.P. art. 652; State v. Abbott, 11-1162. (La.App. 5 Cir. 5/31/12), 97 So.3d 1066, 1068. This burden is not borne by proving the mere existence of a mental disease or defect. Rather, to be exempted from criminal responsibility, the defendant must show he suffered from a mental disease or defect which prevented him from distinguishing between right and wrong at the time he committed the conduct in question. LSA-R.S. 14:14; State v. Milton, 142 So.3d at 165.
In the present case, the State’s requested charge accurately tracks the language of Louisiana law relating to the burden of proof on a defendant when he enters an insanity plea. See State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, 32; State v. Williams, 10-1010 (La.App. 5 Cir. 9/27/11), 76 So.3d 90, 96; State v. Abbott, 97 So.3d at 1068; and State v. Milton, 142 So.3d at 165. Accordingly, we find that the included special jury charge was not erroneous, misleading, or a misstatement of the law, and it does indeed correctly recite the law. This assigned error is without merit.

ADMISSION OF PHOTOGRAPHS

In his second assigned error, defendant contends that the trial court erred in admitting into evidence full-frontal nude photographs taken of him while he was in custody. He contends that these photographs were irrelevant and completely prejudicial, and their admission merely served to deprive defendant of his human dignity and his fundamental right to a fair trial. Defendant points out that he Inconfessed to the crime, and therefore, his appearance on the night of his arrest was not an issue at trial. He argues that *334 by “stripping him of his clothing the State demonstrated unequivocally that appellant had lost all presumption of innocence.”
During the testimony of Sergeant Pel-legrin, the State sought to introduce several photographs, including nude photographs taken of defendant while he was in custody. The State asserted that the photographs were relevant to show defendant’s physical condition on the night in question, to confirm J.W.’s descriptive statement that defendant had hair at the bottom of his penis, and to show that defendant had “very clear eyes for someone who supposedly was too loaded to understand the difference between right and wrong” just a few hours earlier. Over defense counsel’s objection, the trial court allowed the photographs to be introduced.
Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” LSA-C.E. art. 401. All relevant evidence is admissible, except as otherwise provided by law, and irrelevant evidence is not admissible. LSA-C.E. art. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. LSA-C.E. art. 403; State v. Johnson, 09-992 (La.App. 5 Cir. 6/29/10), 47 So.3d 449, 453, writ denied, 10-1704 (La.1/28/11), 56 So.3d 966.
Photographs are admissible if they illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, subject to the test that their probative value outweighs any prejudicial effect. Generally, an appellate court places great weight upon a trial court’s ruling 112on the relevancy of evidence and such a determination will not be reversed absent a clear abuse of discretion. State v. Battaglia, 03-692 (La.App. 5 Cir. 11/25/03), 861 So.2d 704, 710, writ denied, 04-1701 (La.4/29/05), 901 So.2d 1058.
In the present case, we find a clear abuse of the trial court’s discretion in admitting these photographs. The nude photographs of defendant have absolutely no relevance or probative value to the issues involved in this case. Defendant’s identity was never an issue in this trial; therefore, the photographs certainly were not needed to show that defendant looked different at the time of his arrest and that he had hair at the bottom of his penis. To the extent that the State wanted to introduce these photographs to show that his eyes were clear, it certainly did not have to use nude photographs.
Although we feel that the trial court’s decision to admit these photographs was egregious, we need not reverse defendant’s convictions. The erroneous admission of irrelevant evidence is subject to a harmless error analysis. State v. Wright, 04-1038 (La.App. 5 Cir. 2/15/05), 896 So.2d 1172, 1179. An error is considered harmless when the verdict is surely unattributable to the error. State v. Williams, 09-48 (La.App. 5 Cir. 10/27/09), 28 So.3d 357, 365, writ denied, 09-2565 (La.5/7/10), 34 So.3d 860.
In this case, the jury’s verdict was surely unattributable to the alleged error. The State presented overwhelming evidence of defendant’s guilt at trial without consideration of the improperly admitted photographs. In particular, J.W. testified that as she was playing with friends by the gate in front of the apartment complex, a man walked by, picked her up, put her in the front passenger seat of his car, and drove away. He thereafter forced her to perform. oral sex on him as he was driving. *335 The video from the cameras at the apartment complex showed defendant grabbing J.W. and running with her. In addition, defendant, in his statement, recalled that he | is“apparently grabbed ... a little black girl.” Defendant claimed that he did not really recall the details but at some point realized that “she was over in [his] lap,” and that his pants were unzipped. In his statement, he said that he did not think “it went on for any more than five seconds.” When the detective thereafter asked him what went on for five seconds, defendant replied, “I guess oral sex.” Detective Za-notelli also asked defendant if he recalled the girl’s mouth on his penis, to which defendant responded, “that’s when I kind of snapped into it and was like what the f— am I doin[g].” The State also presented DNA evidence. Mr. Cox testified that he compared samples taken from both defendant and J.W. and concluded that J.W. and defendant could not be excluded as contributors of the DNA in the mixture sample from defendant’s penis. He further testified that the DNA profile obtained from the swab of defendant’s penis was greater than one hundred billion times more likely to be a mixture of DNA from defendant and J.W. than a mixture of DNA from defendant and an unknown, unrelated individual. Mr. Cox further testified that “there was definite contact between [J.W.] and the penis of [defendant].”
In light of this overwhelming evidence of defendant’s guilt, we find that the error in the trial court’s admission of the nude photographs was harmless.

ERRORS PATENT REVIEW

We have also reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). A review of the record reflects that the trial court failed to advise defendant of the prescriptive period for seeking postconviction relief pursuant to LSA-C.Cr.P. art. 930.8. While the commitment reflects that the trial court advised defendant of the prescriptive period, the transcript does not so reflect. In accordance with the procedure now routinely | ^employed by this Court, we advise defendant, by this opinion, that no application for post-conviction relief, including áp-plications which seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final, under the provisions of LSA-C.Cr.P. art. 914 or 922. State v. Stokes, 10-171 (La.App. 5 Cir. 10/12/10), 50 So.3d 884, 893.
Accordingly,, for the reasons set forth herein, we affirm defendant’s convictions and sentences.

CONVICTIONS AND SENTENCES AFFIRMED

. In accordance with LSA-R.S. 46:1844(W)(3), the victim, who is a minor, will be referred to by her initials to protect her identity.