STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-379

STATE OF LOUISIANA

VERSUS

TIMOTHY AARON DANGERFIELD

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 38408-11
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of John D. Saunders, Elizabeth A. Pickett, and Van H. Kyzar, Judges.

**AFFIRMED.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **Timothy Aaron Dangerfield**


**John F. DeRosier**
**District Attorney, Fourteenth Judicial District**
**Elizabeth B. Hollins**
**Robert R. "Rick" Bryant**
**Ross Murray**
**Assisstant District Attorneys**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**PICKETT, Judge.**

<u>FACTS</u>

On September 29, 2011, the defendant, Timothy Aaron Dangerfield, beat, stabbed, and shot the victim, Shacrista Nicole Jones. Ms. Jones died as a result of her wounds.

On November 3, 2011, the defendant was charged by a grand jury in a bill of indictment with one count of second degree murder, a violation of La.R.S. 14:30.1, five counts of attempted second degree murder, violations of La.R.S. 14:27 and 14:30.1, and one count of aggravated battery, a violation of La.R.S. 14:34. On November 21, 2011, the defendant entered a plea of not guilty and requested a trial by jury.

On May 16, 2012, the defendant changed his plea to not guilty and not guilty by reason of insanity. On this same date, the trial court appointed a sanity commission. On August 22, 2012, the sanity commission hearing was held, and the defendant was deemed competent to proceed to trial. The matter of whether he was insane at the time of the commission of the offenses was deferred to a later date.

On September 14, 2015, a jury trial commenced. On this date, the state dismissed all but the second degree murder charge. On September 21, 2015, the jury returned a guilty verdict of second degree murder. The defendant was sentenced on November 6, 2015, to life imprisonment without the possibility of parole, probation, or suspension of sentence.

The defendant has perfected a timely appeal, wherein he asserts that the evidence was insufficient to sustain the conviction for second degree murder and

that the trial court should have granted his motion for a mistrial after a witness revealed other crimes information to the jury.

## ASSIGNMENTS OF ERROR

The defendant asserts two assignments of error:

I.     The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979) standard, was insufficient to prove, beyond a reasonable doubt, all of the elements of second degree murder.

II.    The trial court erred in failing to grant a mistrial when a State witness improperly referenced Appellant's "parole officer" during questioning by defense counsel.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant contends that the evidence was insufficient to sustain the verdict of guilty of second degree murder. He maintains that he had established, by a preponderance of the evidence, that he was insane at the time of the offense and was not able to distinguish between right and wrong. He argues that the state, therefore, failed to prove beyond a reasonable doubt that he had the necessary specific intent to commit the offense.

Louisiana Revised Statutes 14:30.1 states, in pertinent part, "[s]econd degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or inflict great bodily harm[.]" Accordingly, at trial, the prosecution has the burden of proving beyond a reasonable doubt that the defendant had the specific intent to kill or inflict great bodily harm upon a victim. Specific intent is that state

of mind that "exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1); *State v. Lindsey*, 543 So.2d 886 (La.1989), *cert. denied*, 494 U.S. 1074, 110 S.Ct. 1796 (1990); *State v. McCray*, 621 So.2d 94 (La.App. 2 Cir. 1993). Specific intent need not be proven as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Graham*, 420 So.2d 1126 (La.1982); *State v. Taylor*, 621 So.2d 141 (La.App. 2 Cir. 1993), *writ denied*, 93-2054 (La. 2/11/94), 634 So.2d 371. The determination of whether the requisite intent is present in a criminal case is for the trier of fact. *State v. Brown*, 618 So.2d 629 (La.App. 2 Cir.), *writ denied*, 624 So.2d 1222 (La.1993).

However, the defendant pled not guilty and not guilty by reason of insanity. The supreme court, in *State v. Siliman*, 95-154, p. 7 (La. 11/27/95), 663 So.2d 27, 32, discussed the affirmative defense of insanity, as follows:

> In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La.R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. La.R.S. 14:14; *State v. Williams*, 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. *State v. Bibb*, 626 So.2d 913 (La.App. 5th Cir.1993), *writ denied*, 93-3127 (La. 9/16/94); 642 So.2d 188; *State v. Claibon*, 395 So.2d 770 (La.1981). Lay testimony pertaining to defendant's actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. *State v. Peters,* [94-0283 (La. 10/17/94); 643 So.2d 1222]; *State v. Claibon, supra.*

In reviewing a claim for insufficiency of evidence in an action where an affirmative defense of insanity is raised, this court, applying the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. *State v. Peters*, 94-0283 (La. 10/17/94); 643 So.2d 1222; *State v. Nealy*, 450 So.2d 634 (La.1984); *State v. Price*, 403 So.2d 660 (La.1981); *State v. Claibon, supra*; *State v. Roy*, 395 So.2d 664 (La.1981).

At trial, the following evidence and testimony were submitted:

On September 29, 2011, Corporal Michael Treadway and Officer Travis Van Zuiden, both with the Lake Charles Police Department, were sent to a residence on Tulip Street in response to a 911 call that a man was banging on the window with a gun. The caller, who was the defendant's aunt, reported that the man was possibly on "wet," a combination of marijuana and PCP. When they arrived, they encountered a young, black male hanging around the area. The officers called out to the man to show his hands. The man answered "f_ _k you." When they called out to him again to show his hands, he responded, "Show me your gun." Both of the officers took cover, one behind a car and one behind a tree. Corporal Treadway testified that Officer Van Zuiden continued giving commands to the man as he advanced towards him. The man raised his arm, and Corporal Treadwell saw a gun in his hand. Fearful that he was going to fire on Officer Van Zuiden, Corporal Treadway shot at the defendant several times, as did Officer Van Zuiden. The defendant collapsed onto the ground.

Corporal Treadway testified that a SWAT team was in the area and arrived immediately after the shooting. He stated that he and Officer Van Zuiden did not approach the defendant but kept cover on him. He said that a member of the

SWAT team approached the defendant, who was lying on his stomach. The defendant had been shot four times. He was taken to the hospital by ambulance. The corporal testified that he thought the defendant was acting strangely because he responded to the officers' challenge by demanding to see their guns. Moreover, he did not appear to be afraid. However, although the defendant appeared aggressive, Officer Van Zuiden did not think the defendant's behavior was strange.

Mayo Romero, an officer and member of the SWAT Division of the Lake Charles Police Department, testified that it was necessary to tase the defendant before they could roll him over. The defendant had the gun and a knife in his hand, and a larger knife was found on the ground beside him. Officer Romero testified that he located a small amount of marijuana on the defendant. Officer Romero also said that as they were putting him into the ambulance, the defendant spit on the officer and screamed about his mother and Nintendo[1] being devils.

After the defendant was taken to the hospital, urine and blood samples were taken, and he tested positive for marijuana, PCP, and benzodiazepines. Dr. John Gray was the emergency room doctor at Lake Charles Memorial Hospital, where the defendant was taken. He testified that in addition to the gunshot wounds, the defendant had lacerations to his neck, throat, and wrist. He said that the defendant was combative and claimed he was possessed by the devil.

Timothy Richards, a detective with the Lake Charles Police Department, was also at the scene of the shooting on Tulip Street. He testified that as he was helping to gather evidence, Marvin Cole, Sr. approached him and quietly told him

---

[1] Detective Timothy Richards testified that the defendant's phone included a contact named "Nintendo," and showed that the defendant had recently contacted him.

there was a body located at a residence on General Patton.  Mr. Cole said that his nephew, Perry Dangerfield, the defendant's brother, told him about the body.

Lecia McCullough, a detective with the Lake Charles Police Department, was at the Tulip Street scene.  She and two other officers were sent to the residence on General Patton to investigate.  As they approached the house, she said that they saw blood beneath the carport near the side door.  When they entered the house they saw "a large amount of blood all over the floor, [the] cabinets in the kitchen, the walls, the floor in the living room, the hall, the back bedroom, and the bathroom in the hallway."  They found a body in the hallway.  She stated that the victim was identified as Shacrista Jones.  It was determined that the victim most likely died that day between 6:00 and 7:00 p.m.    However, an investigator for the Calcasieu Parish Corner's Office agreed that she could have died as early as 4:00 p.m. and as late as 9:00 p.m.

Perry Dangerfield, the defendant's brother, testified that the defendant lived with their mother at the residence on General Patton.  He stated he had encountered the defendant earlier in the day in Kroger's parking lot.  The defendant was in a car with another man.  Perry followed the defendant to their mother's house on General Patton. Standing outside the house were the victim and two other men. Perry shortly thereafter left and went home.  Later, around 7:30 p.m., the defendant called Perry and told him he needed "to holler at you. Come holler at me."   Perry went to the house.  He said that when he first arrived he saw light on in the house and someone looking out the window, and then the light went out.  Perry knocked at the door, but no one answered.  He attempted to enter because he said the door was never locked, but the door was locked.  He testified that he tried to call the defendant on his cell phone and that there was no answer.

Perry testified that shortly after he left the house, he received a call from the defendant. The defendant said he had been out walking, but told Perry "I'm by Mama's house. Come holler at me." Perry stated he did not go back. He related a prior incident that occurred when his brother was on "wet" and had called him out to "come holler at [him]," and then the defendant beat him up. Perry did not go back to the house because he thought the defendant was on PCP, as he was during the prior incident, and would try to beat him up again. Later, however, Perry's mother called him about something happening on Tulip Street and asked him to go check on his brother. After he learned that his brother had been shot, he went to his mother's house on General Patton. While the lights were still off in the house, the door was unlocked. Inside, he found a blood-drenched house and the victim's body.

Perry testified that while the defendant appeared to be fine when he left him at their mother's house earlier, he did not know then whether the defendant was on drugs. He stated, however, that he never saw the defendant act strangely when he was not on drugs. The defendant never told him he was hearing voices or hallucinating. Perry testified that the defendant did suffer from a seizure disorder and was combative when he came out of seizure episodes.

After being declared an adverse witness for the state, the defendant's mother, Vera Dangerfield, testified that she was working the evening of September 29, 2011, until approximately 8:30 or 9:00 p.m. She stated that the defendant, who lived with her, had called her about five in the afternoon and asked her about dinner that night. She stated the victim did not live with them. She said the victim had visited a few times, but she did not know her very well. Ms. Dangerfield said that when she drove up to the house, the defendant met her outside and asked her

to drive him to Tiawanna Papillion's house on Tulip Street.  Ms. Papillion was one of Ms. Dangerfield's daughters.   When they arrived, the defendant got out of the car and aimlessly walked around until she left.  Ms. Dangerfield said the defendant did not seem himself; he was uncommunicative and nervous.  She testified she went over to her other daughter's house.  With her granddaughter driving, they left to go and pick up the girl's mother from work.  On their way, they saw the defendant walking down the street hauling Ms. Papillion along by the arm.  Ms. Papillion was crying.  The granddaughter stopped the car.  Ms. Dangerfield reached out of the car and grabbed Ms. Papillion out of the defendant's grip and pulled her into the car.  Ms. Dangerfield said that after they dropped Ms. Papillion off at her house, they went over to Perry's house.  She told him to check on his brother.  Ms. Dangerfield said she then went back to Ms. Papillion's house where she learned that the defendant had been shot.  Ms. Dangerfield stated she did not see blood on the defendant and did not see a gun in his possession.

Later, Ms. Dangerfield testified during the defense's case.  She testified that approximately three years prior to the current incident, the defendant was boxing and was struck hard in the head and afterwards started having seizures.  She testified that about two to three weeks prior to the death of the victim, the defendant told her that someone was out to get him.  She said he would talk about two acres and a mule but would never explain what he meant.  She recounted an incident which occurred about a year prior to the shooting when the defendant was found running naked through the woods with a shotgun.  He was briefly hospitalized for a psychiatry evaluation.  She said he had medication for the seizures but was unsure if he took the medicine regularly.

8

Ms. Papillion, who was also declared an adverse witness, testified that after her mother had called worried about the defendant, she went outside her house about 9:50 p.m. and was talking to a neighbor, her aunt, when the defendant suddenly appeared. He walked passed them without speaking, then turned around and said, "Well, where they at?" He asked for her phone. Ms. Papillion said she handed him her phone. She started to go back into her house, and the defendant followed her. He then grabbed her and said, "All the devils and demons is gonna die tonight." Once in the house, she ran to her son's bedroom because she could lock the door, but the defendant pushed in behind her. He pushed her to the floor and fired the gun three times. However, the gun did not discharge. She said she could hear the clicks. The defendant then hauled her out of the house and was marching her down the street when they encountered Ms. Dangerfield in her car. Ms. Papillion testified she had never seen her brother take drugs.

Ms. Papillion, while testifying for the defendant, stated that a few weeks prior to the shootings, the defendant started talking about forty acres and a mule. She said that he talked about their family having so much Indian blood that they were entitled to royalties from the casinos. He told her that their ancestors talked to him and were "leading and guiding" him. She again testified that she never saw him take drugs.

Dr. Terry Welke, a forensic pathologist and coroner for Calcasieu Parish, conducted the autopsy on the victim. He testified that the victim had been shot twice, once between the eyes and once in the hand. She also had multiple lacerations, cuts, and stab wounds around her head, face, and neck. Dr. Welke stated that he quit counting the lacerations and stab wounds to her face and neck at fifty. There were blunt force injures to her face, which caused severe breakage of

the bones.  He further testified that there were bruises, stab wounds, and broken bones in her hands, which were consistent with defensive wounds.  The doctor could not state precisely which of the injuries actually caused the victim's death.

Chris Gray, a trooper with the Louisiana State Police, identified the gun taken from the defendant.  He testified that when he examined the gun, there were three spent casings in the gun and no live rounds.  The bullets, one from the victim's head, one from her hand, and one from a door frame across the hall from the bathroom where the victim was found, were identified.  Charles Watson, Jr., a firearms specialist with the Louisiana State Police Crime Laboratory, testified that he also examined the gun taken from the defendant the night of the shooting.  Other than the three spent casings found in the gun, it did not contain any live rounds.  Mr. Watson testified that the gun was in very poor condition.  After noting that the gun had a considerable amount of dried blood on it and that the three recovered bullets, were the same type of bullets fired from that type of gun, Mr. Watson explained:

> I cannot eliminate this firearm as having fired these bullets and I can't say that it did fire those bullets, but one reason might be that the deleterious change, the rust and the corrosion that took place in this barrel could have obscured the detail that I needed to be able to make my conclusion.

Testimony established that there was blood found on the defendant's tennis shoes.  The victim's blood was found on a baseball bat, which overlaid the defendant's palm print.  A broken knife found at the scene of the killing contained both the victim's blood and the defendant's blood.  Finally, the defendant's blood was located on the victim's body.

Dr. Said Cantu, a psychiatrist working at Lake Charles Memorial Hospital, testified he did an evaluation of the defendant following the earlier incident when

he was found walking naked in the woods with a loaded shotgun. He diagnosed the defendant with "delirium secondary to multiple drug intoxication." The doctor stated that the defendant had tested positive for marijuana, PCP, Dilantin, a medication used for seizures, Xanax, and Valium. The doctor agreed that years of severe addictive substance abuse could cause a person to develop a permanent psychosis and that PCP abuse could exacerbate a seizure disorder. The doctor further agreed that his report contained notations by a social worker, which stated that the defendant said he had been smoking marijuana since he was eleven years old. The defendant had said this incident was the first time he had tried "wet," and it made him crazy. Dr. Cantu's report also stated that the defendant said he was upset because his ex-girlfriend was turning his son against him. The defendant said that he was aware he had a shotgun, but he stated that he did not intent to use it. The defendant further denied he was depressed, hallucinating, or anxious. The doctor testified that normally following a seizure a person is sluggish and a bit confused for a period ranging from a few minutes to a few days.

Dr. Roy Lubit, a psychiatrist specializing in forensic psychiatry, testified. After seeing and speaking with the defendant on four occasions, speaking with his family, and reviewing the defendant's medical records, Dr. Lubit theorized that at the time the defendant assaulted the victim, he was suffering from a postictal psychosis, a condition that may follow uncontrolled seizures. The doctor further suggested that the defendant was schizophrenic. He stated that during an episode of postictal psychosis, a sufferer becomes paranoid and has delusions of a religious aspect. The doctor stated that the person believes that someone is the devil and that there are demons. He stated that this condition can continue for days to many weeks. The doctor testified that the first time he spoke with the defendant in jail,

11

he appeared organized and was "making sense." However, the second time he spoke with the defendant, he "was disorganized, rambling, couldn't answer simple questions." The doctor said that the last time he spoke with the defendant, he admitted that he heard voices, "up to three voices talking to each other and that this is ongoing." The doctor reported that the defendant said he was having a non-exclusive sexual relationship with the victim. However, Dr. Lubit explained that this was not a matter of a lover's rage, but that the defendant's actions following the killing, his attacking his sister, his behavior with his mother, and his accusing everyone of being devils and demons were consistent with insanity. The doctor testified that he believed the defendant truly thought he was defending himself against devils and demons, because he did not remember killing the victim and because he never said that the voices or the demons made him do it. Regarding what role the ingestion of PCP had in the defendant's actions, the doctor suggested that "there are certain instances which may have created a false positive result of PCP" in the defendant's system.

Dr. James Anderson, a physician specializing in psychiatry, testified regarding the defendant's sanity at the time of the offense. Dr. Anderson was initially appointed as a member of the sanity commission to determine whether the defendant was competent to assist at trial. However, on November 16, 2012, Dr. Anderson began the interview process with the defendant to determine his sanity at the time of the offense. The doctor testified that he obtained all of the medical records concerning the defendant, including records kept during the time the defendant was incarcerated after the killing. He reviewed all the witnesses' statements, including those who did not testify at trial, and the police reports. Dr. Anderson noted that the defendant reported remembering the day of the offense.

The defendant told the doctor he bought beer earlier in the day. He remembered sitting, talking, and smoking some marijuana with Shacrista. The defendant told Dr. Anderson that he did not kill the victim. The doctor explained to the defendant that if he did not kill her, then that was a not guilty plea. The doctor then realized that the defendant was not aware that he had pled not guilty by reason of insanity and terminated the session until the defendant could speak with his defense counsel.

Dr. Anderson said that the defendant denied that he took drugs. Later, he said that the defendant stated that someone must have slipped him the drug, PCP. He eventually admitted he had taken PCP on another occasion. The doctor noted that when he was evaluating the defendant for the competency hearing, the defendant denied hearing voices or hallucinating. However, after the sanity evaluation began, the defendant stated that he was hearing voices and had the "creepy crawlies." The doctor noted that while the defendant indicated he remembered nothing, as time went on, he remembered more and more things about that day, stopping short of remembering what happened to the victim.

Dr. Anderson noted that the defendant was closely observed while he was incarcerated awaiting trial and that even though he suffered seizures while in jail, no psychosis was indicated. The doctor concluded that at the time of the offense, "with a reasonable degree of medical certainty, [the defendant did] not have a mental disease or defect that impair[ed] his ability to distinguish between right and wrong[.]" The doctor testified that the defendant's subsequent behavior indicated he knew he did something wrong. He called his brother to come to the house, but then he turned off the lights, locked the door, and would not answer the door when his brother knocked. He furthermore met his mother outside the house and

redirected her to Ms. Papillion's house, rather than allowing her inside the house. The doctor noted that even in a psychotic state, a person can know that what they had done was wrong.

Dr. Marminder Mallik, a forensic psychiatrist, also testified regarding the defendant's mental state at the time of the offense. As with Dr. Anderson, the defendant immediately told Dr. Mallik that he did not kill the victim. Dr. Mallik disagreed with the diagnosis of seizure disorder postictal psychosis. He concluded that the defendant did not suffer a mental defect or a psychiatric disorder such that would have precluded him from distinguishing between right and wrong. Dr. Mallik testified that drugs such as PCP acted as a disinhibitor, as did alcohol, but that a disinhibitor was not a mental illness. Dr. Mallik also agreed with Dr. Anderson that even though the defendant had seizures during the four years he was incarcerated following the offense, there was nothing in the jail's medical records which indicated that he presented with a psychosis following the seizures. The doctor pointed out that the record indicated that the only time the defendant acted out aggressively was when he was on drugs, specifically PCP. He noted the incident with the defendant's brother, Perry, the romp in the woods with a shotgun, and lastly, the current incident which resulted in the death of the victim.

Finally, Dr. Charles Weber, an army psychiatrist and director of the Army Substance Abuse Program, testified regarding the defendant's sanity at the time of the offense. Dr. Weber also disagreed with Dr. Lubit. Dr. Weber stated that it was very hard "to say that somebody is psychotic or has a break from reality when they're using drugs that take you from reality." Dr. Weber stated that there was a "high prevalence of violence, aggression, agitation" associated with the use of PCP. However, "[t]o say that I don't know the difference between right and wrong

. . . is a pretty high threshold." As for the defendant's intent, even though exactly what happened in the house the night of the victim's death was unknown, Dr. Weber noted that it is the behavior afterwards which may be determinative, and the defendant's behavior indicated that he knew it was wrong as he attempted to hide it, as opposed to someone who was "flooredly psychotic like schizophrenics, they're not caring about consequences or right and wrong. . . . They don't get to pick and choose and say I'm going to do something that's really horrific and crazy, and I don't want to be found out about." Dr. Weber also pointed out that the defendant made several phone calls the night of the murder:

> It would kind of affirm to make so many different calls, to make both - - when you're making a phone call, one, you've got to know where your phone is. So, you've kind of hit both the occipital lobe where you see; with your memory which is temporal parietal. And he's calling different people on this. And when he's calling different people, one he's calling people that he knows, not just random numbers. So, probably not disorganized and psychotic. And the other portion is coordinated. So, that also leads to the question more than likely, like highly improbable, that this was something that was so disorganized or a postictal where he could not control himself. There's no way to go through a tonic clonic seizure and to be calling all these numbers. So that would be highly unlikely.

While there was no eyewitness to the death of the victim other than the defendant, the direct and circumstantial evidence are sufficient to prove the charged offense of second degree murder beyond a reasonable doubt. In *State v. Williams*, 13-497, pp. 3-4 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, 1239-40, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024, this court outlined the proper means of considering insufficient evidence claims:

> In *State v. Spears*, 05-964, p. 3 (La.4/4/06), 929 So.2d 1219, 1222-23, the supreme court stated that:
>
> > constitutional law does not require the reviewing court to determine whether it believes the witnesses or whether it believes that the evidence establishes guilt beyond a

15

reasonable doubt. *State v. Mussall,* 523 So.2d 1305, 1309 (La.1988). Rather, the fact finder is given much discretion in determinations of credibility and evidence, and the reviewing court will only impinge on this discretion to the extent necessary to guarantee the fundamental protection of due process of law.

"Evidence may be either direct or circumstantial." *State v. Jacobs*, 07-887, p. 12 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 551, *writ denied*, 11-1753 (La.2/10/12), 80 So.3d 468, *cert. denied*, --- U.S. ----, 133 S.Ct. 139, 184 L.Ed.2d 67 (2012). We note that, whether the conviction is based on direct evidence or solely on circumstantial evidence, the review is the same under the *Jackson v. Virginia* standard. *State v. Williams,* 33,881 (La.App. 2 Cir. 9/27/00), 768 So.2d 728 (citing *State v. Sutton*, 436 So.2d 471 (La.1983)), *writ denied*, 00-99 (La.10/5/01), 798 So.2d 963. Circumstantial evidence is that where the main fact can be inferred, using reason and common experience, from proof of collateral facts and circumstances. *Id.* Where the conviction is based on circumstantial evidence, in order to convict, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438.

In the current case, the defendant was the last person to leave the house in which the victim was found dead a short time later. His shoes were bloody, his blood was located on her body, and his and the victim's blood were found on a knife which was located close to her body. The defendant had lacerations on his body. At the time the defendant was apprehended, he possessed the gun which held the same kind of bullets which were extracted from the victim's head and hand. The defendant initially attempted to evade the police officers after they responded to his aunt's call and then flourished his empty gun. The amount of damage inflicted on the victim, including being shot between the eyes, was sufficient circumstantial evidence that the perpetrator "actively desired the prescribed criminal consequences to follow his act[,]" which indicated specific intent to either kill or inflict serious bodily harm. La.R.S. 14:10(1).

16

In brief, the defendant argues that his prior and subsequent behavior, as noted above in the fact section, proved by a preponderance of the evidence that he was insane at the time he committed the offense. The defendant notes that he had complained to family members that someone was out to get him. He told his sister that their family should be getting money from the casinos because they were of Indian descent—the ancestors told him so. He points to his violent actions towards the police, his mother, and his sister. He tried to kill his sister in front of her son, but the gun would not fire. Dr. Gray, the emergency room physician, noted that the defendant said he was possessed by the devil. Witnesses testified that the defendant spoke about seeing demons. The defendant further noted Dr. Lubit's diagnosis of postictal psychosis, which was brought on by the defendant's "long-term, poorly managed seizures," which promoted paranoia and delusions with a religious aspect. Dr. Lubit "explained that a paranoid person believes someone is out to hurt them; these are some of the most dangerous and sick individuals with mental illness." Finally, the defendant points to the fact that he had been hearing voices—up to three voices talking to each other.

In *State v. Currie*, 00-2284 (La.App. 4 Cir. 2/13/02), 812 So.2d 128, *writ denied*, 02-786 (La. 11/15/02), 829 So.2d 421, the defendant was found guilty of second degree murder for the stabbing death of his mother. The fourth circuit reversed the conviction, finding that the facts established, by a preponderance of the evidence, that he was incapable of distinguishing right from wrong. The defendant, fifteen at the time, stabbed his mother twenty-two times at the poolside of a New Orleans hotel. He also cut the throat of a friend who was traveling with him and his mother. When his friend attempted to stop his attack, the defendant slit his own throat and walked back to his room. When the police arrived, the

defendant was sitting in the middle of the floor with his throat and wrist cut. After the police officer announced he was a homicide detective, the defendant asked him if his mother was dead. At the hospital, the defendant named his mother as his emergency contact. However, when told she was dead, he said he killed her. The defendant's friend testified that the evening before, he and the defendant had smoked marijuana, drank alcohol, and had taken two tabs of LSD each.

At the defendant's trial, four doctors testified regarding his mental health. Currie had begun psychiatric treatment when he was eleven years old after making violent threats at school. He was suspicious, paranoid, and believed people were taking thoughts from his head. At the time, the doctor treating him testified that he "hesitated to diagnose the defendant with schizophrenia because of the label it placed on the child[,]" but he said the symptoms were psychotic and that the defendant suffered from a "'very, very serious illness.'" *Id.* at 132. A second doctor who treated the defendant for depression and attention deficit disorder testified that the defendant carried images of chopped up and burned bodies in his mind. The defendant also had evidence of organic brain injury from an accident when he was very young. The doctor testified that the defendant met all the criteria for paranoid schizophrenia. The doctor further testified that persons with mental disorders were much more susceptible to the effects of recreational drugs.

After he was arrested and charged, a sanity commission was appointed. Currie was found to be incapable of assisting at his trial and was sent to a state mental health facility for treatment until he was able to proceed to trial. As for whether he was insane at the time of the killing, several doctors testified as follows:

18

Dr. Jodi Holloway, psychiatrist, said she was assigned to the defendant's case after it was determined that he was not competent to proceed to trial. She diagnosed him as a paranoid schizophrenic with polysubstance dependence. She determined he was psychotic by his withdrawn demeanor, his difficulty interacting, his paranoid delusions, and his apparent auditory hallucinations. He had dreams of being impaled and other persecutions. He was suicidal: storing aspirin in overdose quantities at the hospital, trying to hang himself, bashing his head against the wall. He believed he had supernatural powers including the ability to stare into the eyes of humans and animals to scare them and the ability to move cars with his mind. The doctor said schizophrenics are at particular risk to become drug users. Family members, in particular mothers, are at particular risk of harm. The condition is strongly genetically based. A family that is dysfunctional can exacerbate symptoms.

Dr. Kenneth Perez, child psychiatrist, said he treated the defendant while he was on the adolescent wing at Southeast Louisiana Hospital in Mandeville, from March 1998 to July 1999 when he was transferred to the adult unit. He described him as psychotic and depressive. He said the defendant's brain was under a lot of stress, and in many situations such as his, the brain will interpret noise stimulation as voices from religious figures. In the defendant's situation, he thought he was hearing the voice of Seth, the Egyptian god of death. He had turned to Seth after he had been sexually abused as a child, and thought Seth would protect him from the taunts of schoolmates that he was queer. The doctor felt there was a strong possibility that he had inherited schizophrenia from his mother, and that he had an extraordinarily unusual early onset of the disease. His chances of suffering from schizophrenia were further enhanced by his grandfather's schizophrenia.

. . . .

Dr. Sarah Deland, clinical psychiatrist, testified she is often asked to evaluate people with regard to their sanity at the time of the offense. She said she only finds about ten percent of the people she evaluates to have been insane at the time of the offense, and cautioned that even that ten percent is of a group already known to have a mental illness. In this case, she met with the defendant only four days after the crime. She also interviewed an extensive list of people including family members, neighbors, and the psychiatrists and psychologists that treated the defendant over the years. She said that she determined that the defendant suffers from paranoid schizophrenia and that he suffered from that disease when he committed the crime. She said that his family's extensive history of mental illness put him at greater risk for the disease. Also, his brain injury at birth and a brain injury suffered at one year old contributed. She noted his increased delusions and fascinations with death and vampires, which

he believed to be real. He also had strange patterns of not eating and sleeping for days at a time. The doctor stated that schizophrenics also often use street drugs to help them feel better, to suppress voices, and to help them sleep. She was confident in her determination that the defendant did not know right from wrong when he killed his mother, and said he was definitely ill at the time, having been off of his medication for over a year. In the days before the crime, he had become increasingly frightened and paranoid and thought The Draven was involved in a war for souls and the people surrounding him were "imposters" including The Draven, Battistelli, and his mother. The doctor pointed out that the defendant committed the crime in broad daylight with people around, made no attempt to flee, and then slashed his wrists and throat. She said schizophrenics are at a great risk for suicide. They often take out violence on people they know because they have trouble in relationships and are not close to other people. They begin to fear the people they are around on a continual basis; here, the defendant was closest to his mother. She said that while people with him on the night before the crime said he had taken drugs, there was no proof that he had taken any, or that the drugs he had taken were effective, or that they had not worn off by the time of the crime. Nothing on his hospital admission records was indicative of his having taken drugs.

*Id*. at 132-34.

As in the current case, Dr. Mallik testified in *Currie* as a state's expert witness regarding the defendant's sanity at the time of the stabbing. He concluded that the defendant, despite a severe mental illness, was able to distinguish between right and wrong when he stabbed his mother to death, as follows:

His diagnosis of the defendant's mental state at the time of the offense was hallucinogenic intoxication, alcohol and cannibis [sic] abuse, history of major depression with psychotic features, and history of intermittent explosive disorder on Axis I. Axis I is a measure of clinical psychiatric syndromes. He said the defendant "has a mental disorder, but I don't think, in my opinion, to a reasonable degree of medical certainty that those disorders caused him to be incapable of distinguishing between right and wrong at the time of the offense." The doctor reported the defendant's long history of drug taking, told to him by the defendant and corroborated by his best friend, starting with drinking vodka and whiskey in the morning before school when he was nine; continuing with smoking half a bag of marijuana a day; smoking "Premo" which is marijuana with crack added; inhaling nitrous oxide; eating hallucinogenic mushrooms; smoking Ritalin; dropping acid; shooting cocaine; taking "Absence" which is alcohol

fermented with Cartlum, annis seeds, fennel, and Tujon which is a "legal" hallucinogenic; and smoking PCP.

The defendant described to the doctor the events leading up to the crime, including his running away from his father because his father was going to commit him, taking Ritalin, and stealing money from his father to get to New Orleans. He said he was suicidal. He found a "squat", or a homeless person's hut, to live in.

*Id.* at 134. The doctor went on to testify that the defendant, however, skipped over the killing, but "'realized something had happened' when he threw the knife[,]" and called the killing an accident. *Id*. at 135.

Dr. Mallik further testified that the defendant was able to describe small details and draw an accurate map of the events which were corroborated by Battistelli and by the doctor himself on a tour of the hotel. He said these factors indicated "goal driven" behavior and that the defendant was able to determine right from wrong at the time he committed the crimes.

On cross, he said that the defendant appeared very disturbed while sharing his experiences. He seemed to be responding to internal stimuli, and listening to "souls." He would close his eyes, and exhibit peculiar hand gestures as if he were twirling.

*Id.*

The fourth circuit, however, stated:

In this case, this court cannot imagine a case wherein an insanity defense could possibly be more strong. Thus, the facts of the case simply do not support the conclusions of Dr. Mallik. This defendant was fifteen at the time of the crime, from a broken home in which both sides of his family had severe mental illnesses. He suffered organic brain damage at birth. He suffered a fractured skull at one year old. He was institutionalized by the age of six, and essentially diagnosed with schizophrenia by the age of eleven. He had little emotional support at home, and his own mother exhibited signs of schizophrenia. At the least, she exhibited signs of very poor judgment in bringing the defendant back to New Orleans and buying him a knife along the way. The father allowed him to be off of his anti-psychotic medication for over a year before the crime. He was suffering from delusions, hallucinations and ideas of persecution for some time preceding the crime. Although, admittedly, much of the evidence presented by the defense summarized his mental history prior to the crime and did not go to the ultimate fact of whether he understood right from wrong at the time of the offense, as explained

by the experts, many of the factors present in his life contributed to or exacerbated his proclivity to have been unable to differentiate between right and wrong.

He committed the crimes in broad daylight in front of many witnesses. He did not attempt to flee. He was found within minutes in a trance-like state. After admitting he had killed his mother, he asked for her comfort shortly thereafter. These do not appear to be the acts of a man who can distinguish right from wrong.

Although Dr. Mallik's testimony was to the contrary, his conclusion of hallucinogenic intoxication was based almost exclusively on interviews with the defendant who reported his own drug use to the doctor at a time when he was psychotic. There was little corroboration of the history of his drug [use] by independent or objective sources.

Applying the principles set forth in [*State v.*] *Silman*, [95-154 (La. 11/27/95), 663 So.2d 27] to the facts and circumstances of the instant case and viewing the evidence in a light most favorable to the prosecution, this court finds that no rational trier of fact could have found that defendant failed to prove by a preponderance of the evidence that he was incapable of distinguishing between right and wrong, and therefore insane, at the time of the crimes. Accordingly, we vacate the original conviction and find defendant not guilty of second degree and attempted second degree murder by reason of insanity.

*Id.* at 138.

In another case where the defendant was found not guilty of second degree murder by reason of insanity, *State v. Armstrong*, 94-2950, pp. 11-12 (La. 4/8/96), 671 So.2d 307, 312, the supreme court noted:

[T[he defense's case on insanity consisted of the twenty-five year history of mental illness with delusions, auditory hallucinations, religious obsessions and occasional psychotic episodes, particularly when defendant was subjected to stress or failed to take his medication; the testimony of three psychiatrists and one psychologist who opined that defendant could not distinguish right from wrong at the time of the killing; evidence of defendant's dispute with his bank causing him stress, a precursor of psychotic episodes, and of his involuntary commitment to a mental institution shortly before the killing and his violent behavior there; and extensive evidence of bizarre behavior, before and after the killing, which was consistent with conduct that has led to his numerous hospitalizations.

In *Armstrong*, the defendant entered a mortuary seeking his father's death certificate. In the mortuary were a woman and the victim, Reverend Fred Neal. While the woman searched for the death certificate, the defendant left. He returned forty-five minutes later. Without a word, he opened a brief case and took out a large knife. The woman fled and called the police. When the police arrived, the defendant was standing over Rev. Neal with the bloody knife. The reverend had been stabbed several times. Ignoring the officers' order to drop the knife, the defendant walked away and then turned back. While the officers attempted to talk to the defendant, he severed the reverend's head. He grabbed the body, seated it in a chair, and proceeded to take the severed head and put it into the toilet. He was convinced the reverend was the anti-Christ. The defendant was arrested for second degree murder but found to be incapable to proceed to trial. He was institutionalized at East Feliciana Mental Health Facility. Four months later, he was deemed sufficiently competent to stand trial. The supreme court noted that the defendant "had been medically discharged from the service as a paranoid schizophrenic in the late 1960s during the Viet Nam conflict. Defendant had been admitted to mental institutions in 1969, 1970, 1973, 1974, 1980, 1983, 1987 and 1992, having been released three days before the killing of Rev. Neal." *Id*. at 308. After reviewing the testimony and the evidence, the supreme court concluded:

> Other evidence stressed by the district attorney was the fact that defendant did not attempt to kill, or even threaten, anyone but Rev. Neal and that he had sat in his car peacefully until he saw Rev. Neal enter the mortuary. Such behavior, however, is consistent with the delusion that Rev. Neal was the anti-Christ and with the auditory hallucination telling defendant "That's him." The doctors who found defendant insane at the time of the crime commented that he was no danger to anyone but the anti-Christ of his delusion. The fact that the policemen did not feel threatened was not inconsistent with that delusion or with the hallucinatory command.

23

As to defendant's allegedly selective responses to hallucinatory voices, one telling him to kill and the other telling him later that killing is wrong, it was the very nature of defendant's delusion that Rev. Neal was the anti-Christ that compelled defendant to send the anti-Christ to hell. Evidence that a person, in a psychotic state and operating under a long-standing delusion about the anti-Christ, is unable to evaluate competing auditory hallucinations is hardly preponderating proof of ability to distinguish right from wrong.

Moreover, the fact that defendant decapitated Rev. Neal in view of several police officers militates strongly against a conclusion that he knew he was doing wrong at the time. Indeed, the most significant evidence of ability to distinguish right from wrong in many insanity defense cases is evidence of the accused's attempts to hide evidence of the crime. Conversely, evidence of criminal conduct in plain view of law enforcement officials is a significant indication of inability to distinguish right from wrong.

*Id*. at 313.

In *State v. Milton*, 13-672 (La.App. 5 Cir. 5/14/14), 142 So.3d 157, the fifth circuit affirmed the verdict of attempted second degree murder, agreeing that the defendant failed to establish the affirmative defense of insanity by a preponderance of the evidence. In *Milton*, the defendant, for unexplained reasons, shot the victim three times while the victim sat in his truck. A sanity commission was appointed, and the defendant was committed to East Feliciana Mental Health Facility for six months until he was deemed competent to assist in his defense at trial. As in the current case, the defendant in *Milton* received a head injury at a young age. However, as a result of the injury, the defendant underwent brain surgery and lost the use of an arm and a leg for six months. Expert testimony regarding the defendant's sanity was given at trial, as follows:

Dr. Vosburg explained that as a result of the car accident, Defendant sustained major damage to the left temporal region of his brain, requiring neurosurgery. The doctor added that an injury to this region of the brain may result in seizures, as well as frequent mood problems, such as depression, anger, rage, irritability, poor judgment, poor insight, and poor impulse control. Since the accident, Defendant had suffered from seizures and had displayed "rage attacks."

24

Dr. Vosburg also observed that since the injury, the severity and frequency of Defendant's assaultive behavior had dramatically escalated. Prior to his injury, Defendant had two criminal convictions: battery and resisting arrest. And, Defendant's mother testified that as time progressed after the surgery, her son's mental condition deteriorated, where he was always angry and could not control himself. Ms. Milton described several incidents where Defendant was involved in physical altercations. These included Defendant striking two people and dragging his mother down steps. Consequently, Ms. Milton had Defendant admitted to the psychiatric ward at Charity Hospital, where he was diagnosed with schizophrenia. Dr. Vosburg explained that he disagreed with this diagnosis and believed that Defendant was exaggerating his claimed memory problems, where the doctor did not observe any evidence of short term memory loss.

*Id.* at 166.

After reviewing the testimony and the defendant's actions prior, during, and subsequent to the shooting, the fifth circuit concluded:

Furthermore, we find Defendant's actions during and after the shooting do not support a finding of insanity. The evidence adduced at trial established that Defendant, albeit for unclear reasons, appeared on the scene angry and yelling, and threatened the victim and his friends. According to Defendant, he was armed at this time, but he left the scene without resorting to violence. Yet, when he returned to the scene, he carried out his threat by shooting the victim.

If Defendant was armed during the initial encounter, as he contends, but left the scene and returned before carrying through with his threat, we find this delayed consummation of the threat exhibits a degree of self-control inconsistent with a claim of insanity. On the other hand, even if Defendant was not armed during the initial encounter and left to retrieve his weapon, this, too, demonstrates a degree of calculation inconsistent with insanity.

After firing his weapon three times at the victim, Defendant, apparently realizing what he had done, shifted his aim and discharged the remaining rounds into the air, as he explained, out of respect for his relationship with the victim's family and God. Defendant then drove to Baton Rouge and disposed of the weapon. Then, in his statement, given within 24 hours of the shooting, Defendant declared that he felt guilty for what he had done and that he prayed for the victim's survival.

Defendant's decision to shift his aim away from the victim, his subsequent feeling of guilt, prayers for the victim, flight to Baton

Rouge, and disposal of the weapon all demonstrate that Defendant had a guilty conscience and recognized his culpability for his actions. *See State v. Jones*, 12-750 (La.App. 5 Cir. 5/16/13); 119 So.3d 250, 257 n. 8 (finding a defendant's flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience). Thus, we find that through his actions, Defendant displayed a functioning ability to distinguish right from wrong.

Viewing the foregoing evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have concluded that Defendant failed to prove by a preponderance of the evidence that he was unable to distinguish between right and wrong at the time of the offense.

*Id*. at 167-68.

In *Currie* and *Armstrong*, the defendants had long, extensive, and well-documented histories of mental illness. In *Currie,* the defendant was hospitalized for the first time at six years old and diagnosed as a schizophrenic at eleven. Mr. Armstrong was diagnosed in the 1960s with schizophrenia and was hospitalized six times up to a few days before he killed his victim. During those years, Mr. Armstrong suffered with auditory hallucination, paranoia, and religious obsessions. He was often hospitalized when he became convinced he was called to preach and to kill someone.

In the current case, as in *Milton,* the defendant suffered seizures for three years prior to the offense as a result of a blow to the head. However, the only time he had a mental health evaluation was a year prior to the offense when he was caught running naked outdoors with a shotgun and on PCP. The family members testified that shortly prior to the killing, the defendant was saying strange things about acreage and a mule and that the family's Indian ancestors told him they were entitled to money from the casinos. While Ms. Papillion testified that the defendant thought someone was after him and talked about demons, he had no history of mental illness. The defendant's mother testified that she asked the

26

defendant to get counseling several times. Furthermore, except for the beating he inflicted on his brother when he was on drugs, there was little testimony about whether the defendant was otherwise violent or aggressive prior to the killing.

In *Milton*, the defendant had a history of aggression and, as in *Currie* and *Armstrong*, was initially deemed incompetent to proceed to trial and spent time in a mental institution being treated for his mental illness prior to trial. In the current case, the defendant was evaluated and found to be competent after a sanity commission was appointed.

In *Milton,* the fifth circuit noted that the defendant declared that he was going to shoot someone and, after shooting the victim, he fired a few more shots into the air, then drove to Baton Rouge and disposed of the gun. The fifth circuit found this behavior indicated "a functioning ability to distinguish between right and wrong." *Milton*, 142 So.3d at 168. Similarly, in the current case, the defendant's behavior indicated he was aware of what he did. The defendant turned out the lights and locked the door to keep his brother out of the house. He met his mother outside the house and got her to drive him to his sister's house. As expressed by Dr. Weber, people who commit atrocious acts necessarily "don't get to pick and choose and say I'm going to do something that's really horrific and crazy, and I don't want to be found out about." In *Armstrong*, the defendant beheaded the man he stabbed to death in front of the police and made no effort afterwards to get away. In *Currie*, the defendant stabbed his mother in broad daylight, in front of witnesses, and then, after slitting his own throat, waited for the police.

While Dr. Lubit opined that the defendant was insane at the time of the offense because he did not say that the demons or the devil made him kill Ms.

27

Jones, we note that in both *Armstrong* and *Currie*, the defendants acknowledged their actions and articulated to a degree their belief that there was some justification. In *Armstrong*, the defendant believed the reverend was the anti-Christ, while in *Currie*, that defendant, although he at times exclaimed that "The Draven" made him do it, believed that everyone was an imposter, including his mother. In the current case, while there was testimony that the defendant called his mother and Nintendo devils, he never once called the victim, Ms. Jones, a demon or a devil. He claimed to have no memory of what happened but denied that he killed her.

In brief, the defendant points out that he struck and knocked his mother down, and after he went to his sister's house, he attempted to kill her, thereby evidencing his insanity. However, as noted above, there were only three bullets in the gun, and all three were discharged at his mother's house where the victim was killed. There was no testimony that more bullets of the type used in the gun were located at the house where the victim was killed or on the defendant's person after he was shot. There was no testimony indicating whether he was aware that the gun was no longer loaded. However, according to Ms. Papillion, the defendant attempted to discharge the gun three times. No matter whether defendant was aware of the fact he was out of bullets, if he had truly desired to kill his sister, he had two knives on his person at the time.

The brutality of the killing and the damage inflicted on the victim suggests some type of rage, which according to his mother and sister seemingly was not in character with the defendant. However, reviewing the testimony regarding the defendant's behavior prior to and subsequent to the killing, and comparing and distinguishing the facts in the above cases with the facts of current case, we find

28

that the defendant failed to meet his burden of establishing by a preponderance of the evidence that he was insane at the time of the killing.

The defendant also suggests, in the alternative that, should this court find that he did not meet his burden of establishing his insanity at the time of the killing, he was so highly intoxicated that he was unable to form the requisite specific intent to inflict serious bodily harm or death on the victim.

"[V]oluntary intoxication can be considered as a defense only in cases where specific intent is a necessary element of the crime." *State v. Boleyn*, 328 So.2d 95, 98 (La.1976). "Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime." La.R.S. 14:15. Since intoxication is an affirmative defense, the defendant bears the burden of proving the existence of that condition at the time of the offense. *State v. Bias*, 10-1440 (La.App. 3 Cir. 5/4/11), 63 So.3d 399, *writ denied*, 11-1063 (La. 11/14/11), 75 So.3d 939. "[T]hereafter, it falls to the state to negate that defense by showing beyond a reasonable doubt that specific intent was present despite the defendant's alleged intoxication." *State v. Mickelson*, 12-2539, p. 7 (La. 9/3/14), 149 So.3d 178, 183. "Whether voluntary intoxication in a particular case is sufficient to preclude specific intent is a question to be resolved by the trier of fact." *Id.*

While PCP and marijuana were detected in the defendant's system after he was taken to the hospital, there was very little testimony regarding the defendant's drug ingestion on the day of the killing. The defendant offers little in the way of establishing that he was so intoxicated that he was unable to form the requisite specific intent. While PCP and marijuana were detected in the defendant's blood

29

and urine analysis when he was taken to the hospital after the offense, there was no blood/alcohol content reported in his system. Furthermore, Dr. Weber testified that PCP has a peak of two to four hours in the system and it can stay in the system for twenty-one to forty-six hours. On the one other occasion the defendant admitted he took PCP, he recalled the incident and expressed remorse for running through the woods naked with a shotgun. The defendant did not meet his burden of establishing intoxication such that could have precluded the capacity to form specific intent. The state showed beyond a reasonable doubt that specific intent was present in this case.

## ASSIGNMENT OF ERROR NUMBER TWO

The defendant argues that the trial court erred when it denied his motion for a mistrial after a witness impermissibly referred to other crimes evidence during his testimony. During Dr. Anderson's cross-examination, he referred to the defendant's "parole officer." Louisiana Code of Evidence Article 404(B), in pertinent part, provides that "[e]xcept as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."

The questioning which resulted in Dr. Anderson making the remark started with the following exchange between him and defense counsel:

A. There's no reason for me to believe that Mr. Dangerfield had a psychotic thought disorder in the past other than when he was intoxicated on PCP. He had no history of mental health treatment. He had a history of substance abuse treatment and was Court Ordered to be in a treatment facility. But he had no history of psychiatric treatment, no psychotic delusions, no hearing voices for a period of time until he was charged with this crime. And then they crop up.

He does have a history of using PCP and having violent behavior, and PCP and having violent behavior prior to this event.

30

Q. You know, I'm always taken aback by - -

A. So, even though you're trying to draw conclusions - -

Q. Right.

A. - - and you can say is it possible that, I'm saying it is so highly improbable. There's no history of it. There's no paper trail of it until we get to this point in time, and then it pops up.

[Q.] You know, I'm always taken aback by psychiatrists and their use of the term "history." How many positive PCP tests did you see in his records?

A. How many does it take?

Q. No. That's not the question. I'm asking you a question.

A. I saw two - -

Q. Two - - you saw - -

. . . .

A. Two.

Q. You saw two. And the term that you're using is a history. One for the offense that he's charged with and then one instance that happened a year ago.

A. And the brother in between.

This conversation continued at length regarding whether the defendant had a "history" of PCP usage. Defense counsel then asked:

Q. And one of the things that you keep alluding to is the fact that my client might have been making this up. Isn't it true, Dr. Anderson, that people make up things or may not share with you certain information simply because it might be embarrassing to them?

A. Yeah. That certainly is a possibility.

Q. And also when you talked about substance abuse, that's a term of - - well, we as lawyers call it a "term of art." And you stated earlier that my client said, at one point he didn't use PCP or he only used PCP at one point. And then, at another time you said that he denied being a substance abuser. Is it possible that he didn't understand or

31

didn't perceive himself as a substance abuser as opposed to lying to you?

A. I think - - okay. So you're asking me the ques - - I think if an individual has been ordered by their parole officer to go to treatment, they would understand, you know, years prior that they have a history, they have a substance abuse problem. And if they had previously said that they had used substances, they would know they have a substance abuse problem. So I don't think it's a memory thing.

Following the state's redirect examination of Dr. Anderson and after the jury was excused from the courtroom, defense counsel objected to the doctor's reference to the defendant's "parole officer," and moved for a mistrial. During argument on the issue, the state argued that Dr. Anderson was only responding to defense counsel's question concerning whether the defendant was aware that he was abusing drugs. The state further pointed out that the information regarding the defendant's long-time use of drugs and the incident of being caught in the woods naked with a shotgun was "other crimes" evidence admitted without objection. After a lengthy argument between defense counsel and the state, the trial court denied the motion for a mistrial.

In brief, the defendant argues that La.Code Crim.P. art. 770 provides, in pertinent part:

> Upon motion of a defendant, a mistrial shall be ordered when remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> . . . .
>
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible[.]

The reference to "other crimes" evidence was not made by the judge, district attorney, or a court official. Although Article 770 is not applicable, La.Code Crim.P. art. 771, in pertinent part, provides that upon the request of the defendant,

the court shall admonish the jury to disregard the remark "[w]hen the remark or comment is made by a witness or person other than the judge, district attorney, or a court official[.]" While the trial court agreed with the state that the remark was in response to a question asked by defense counsel and that the defendant's drug history was relevant and not prejudicial, it offered to admonish the jury. Defense counsel declined an admonishment, stating it would likely "amplify" the comment.

In brief, the defendant argues that as opposed to a "probation" officer, the term "parole" officer was prejudicial, as follows:

> The issue is the perception and affect the mention of a prior parole officer had on the jury. It is asserted that an average person would understand that one does not have a parole officer unless they have been convicted of a more serious crime and had spent some period of time incarcerated for the crime.

We find no error in the trial court's denial of the motion for a mistrial. Pursuant to La.Code Crim.P. art. 771, the trial court proposed an admonishment to the jury to disregard Dr. Anderson's statement. Defense counsel declined. This court has held that in order for a reference to other crimes evidence to require such a drastic remedy as a mistrial, "there must be a distinct or recognizable reference to another crime alleged to have been committed by the defendant." *State v. Chambers*, 99-678, p. 8 (La.App. 3 Cir. 1/19/00), 758 So.2d 231, 236, *writ denied*, 00-551 (La. 9/22/00), 768 So.2d 600. In *Chambers*, this court affirmed a trial court's ruling that a mistrial was not appropriate after a police officer made reference to multiple identifications and aliases found on the defendant's person at the time of the arrest. Likewise, in *State v. Barnes*, 13-576 (La.App. 3 Cir. 12/11/13), 127 So.3d 1070, *writ denied*, 14-43 (La. 6/13/14), 140 So.3d 1188, this court found that a statement made during voir dire that the defendant had been in

jail with a prospective juror did not merit a mistrial.  We find this assignment of error lacks merit.

## CONCLUSION

We affirm the defendant's conviction of second degree murder.

**AFFIRMED.**